# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SORRENTO THERAPEUTICS, INC., a Delaware corporation, and SCILEX PHARMACEUTICALS INC., a Delaware corporation, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2021-0210-PAF |
| ANTHONY MACK, an individual, and VIRPAX PHARMACEUTICALS, INC., a Delaware corporation, | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

Date Submitted:  January 20, 2023
Date Decided:  September 1, 2023

Kevin M. Coen, Alexandra M. Cumings, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Jamie L. Wine, Steven N. Feldman, LATHAM & WATKINS LLP, New York, New York; Matthew W. Walch, Russell Mangas, LATHAM & WATKINS LLP, Chicago, Illinois; *Attorneys for Plaintiffs Sorrento Therapeutics, Inc. and Scilex Pharmaceuticals Inc.*

Elizabeth A. Sloan, Brittany M. Giusini, Fred DeRitis, BALLARD SPAHR LLP, Wilmington, Delaware; Paul Lantieri III, BALLARD SPAHR LLP, Philadelphia, Pennsylvania; *Attorneys for Defendant Virpax Pharmaceuticals, Inc.*

Stephen B. Brauerman, Justin C. Barrett, BAYARD, P.A., Wilmington, Delaware; *Attorneys for Defendant Anthony Mack.*

**FIORAVANTI, Vice Chancellor**

Anthony Mack is a successful pharmaceutical executive who has founded several pharmaceutical companies over the course of his more than 30-year career. One of those businesses was Scilex Pharmaceuticals Inc. ("Scilex"), a pain-focused company which was actively trying to shepherd ZTlido, an early-stage drug candidate, through the FDA approval process. In 2016, Mack engineered the sale of a controlling stake in Scilex to Sorrento Therapeutics, Inc. ("Sorrento"), for which Mack received $12 million. Mack agreed to stay on after the sale as Scilex's President and to seek potential investment opportunities for Scilex. He also signed a non-competition agreement.

Immediately after the transaction, Mack began developing a new pharmaceutical business aimed at pain management. While serving as Scilex's President and under the restrictions of the non-compete, Mack diverted development opportunities to his other enterprises. All the while, Mack took steps to conceal his conduct from Sorrento and the Scilex board. He downloaded a trove of Scilex documents to his personal devices and later uploaded those documents to the servers of his new company. Mack's new company, Virpax Pharmaceuticals, Inc. ("Virpax"), has since gone public and has three drug candidates, each of which arises from a development opportunity presented to Mack during his time at Scilex. Sorrento and Scilex contend in this litigation that those products compete with ZTlido.

Sorrento and Scilex have asserted claims against Mack for breach of contract, breach of fiduciary duty, and misappropriation of trade secrets, and against Virpax for tortious interference, aiding and abetting Mack's breaches of fiduciary duties, and misappropriating trade secrets. In this post-trial opinion, the court addresses liability, finding: (1) Mack breached the RCA by developing Epoladerm; (2) Virpax is liable for tortious interference with contract; (3) Plaintiffs waived their claims for breach of Mack's employment contract and for tortious interference with prospective economic advantage; (4) Mack breached his fiduciary duty of loyalty to Scilex; (5) Virpax aided and abetted Mack's breach of fiduciary duty; and (6) Mack misappropriated certain Scilex trade secrets. The question of an appropriate remedy must await further proceedings.

## I. BACKGROUND

What follows is the court's findings of fact following trial.[1]

### A. The Parties

Sorrento is a biopharmaceutical company that develops and markets pharmaceuticals intended to fight cancer, manage pain, and prevent and treat Covid-

---

[1] Citations to testimony presented at trial are in the form "Tr. # (X)" with "X" representing the surname of the speaker, if not clear from the text. After being identified initially, individuals are referenced herein by their surnames without regard to formal titles such as "Dr." No disrespect is intended. Exhibits are cited as "JX #," and facts drawn from the parties' Pre-Trial Stipulation and Order are cited as "PTO ¶ #." *See* Dkt. 195. Unless otherwise indicated, citations to the parties' briefs are to post-trial briefs.

19.[2] Sorrento is headquartered in California and incorporated in Delaware. Dr. Henry Ji cofounded Sorrento in 2006, and has served as its CEO and President since 2012 and Chairman of the board of directors since 2017.[3] Through the date of trial, Sorrento was publicly traded on the Nasdaq stock exchange under the symbol "SRNE."[4]

Scilex is a Delaware corporation engaged in pharmaceutical development. Scilex's mission is to develop and commercialize non-opioid pain-management products. Scilex has one product on the market, a 1.8% lidocaine patch called "ZTlido."[5] Sorrento acquired 72% of Scilex's outstanding common stock in November 2016.[6]

Defendant Anthony Mack has worked in the pharmaceutical industry for more than 30 years. Between 1998 and 2009, Mack worked as a Hospital Training Manager for Purdue Pharma, a Product Manager for Endo Pharmaceuticals, and a National Sales Director for EKR Therapeutics.[7] During this period, Mack leveraged his background in pharmaceutical sales to assist in the development and marketing

---

[2] JX 552 at 4.

[3] JX 624 at 2.

[4] Tr. 369:15–16 (Shah); JX 309 at 53.

[5] JX 552 at 8.

[6] JX 393 at 104.

[7] JX 243 at 27.

of Lidoderm, a prescription 5% lidocaine patch with an indication of post-herpetic neuralgia.[8]  In 2009, Mack founded ProSolus Pharmaceuticals LP ("ProSolus"), a pharmaceutical company focused on developing and manufacturing transdermal drug delivery products.[9]  Mack left ProSolus after it was sold to Mission Pharmaceutical Company in 2015.[10]

Mack co-founded Scilex in 2012 with Bill Dixon, who had also been involved with ProSolus.[11]  Mack later recruited George Ng, the lawyer for ProSolus, to join Scilex.[12]  At Ng's urging, William Pedranti also joined the Scilex management team.[13]  In 2013, Scilex licensed a preclinical product that would later become ZTlido.[14] Shortly after obtaining that license, Scilex raised approximately $5 million through Aegis Capital, a company affiliated with Ji and with George Uy.[15]  In total, Scilex raised between $100 and $140 million to commercialize ZTlido.[16]

---

[8] *Id.* at 11, 27.

[9] *Id.*

[10] *Id.*

[11] Tr. 435:19–20 (Mack).

[12] *Id.* at 435:22–436:4.

[13] *Id.*

[14] *Id.* at 436:10–24.

[15] *Id.* at 437:15–18.

[16] *Id.* at 673:11–19 (Sahebi).

In 2013, Mack also founded IACTA Pharmaceuticals ("IACTA").[17] IACTA was focused on developing products for eye care and was owned by Mack, Pedranti, Damon Burrows, and Ng.[18] Mack, Pedranti, Burrows, and Ng already owned another entity, Troy Capital Health ("Troy").[19]

Virpax is a Delaware corporation with a principal place of business in West Chester, Pennsylvania.[20] Virpax's stock began trading under the symbol "VRPX" on the Nasdaq stock exchange on February 17, 2021.[21] Mack is the Chairman and CEO of Virpax.[22]

## B. The FDA Approval Process

Before a new drug can be marketed for human use, the U.S. Food and Drug Administration (the "FDA") must approve it. Three potential routes to approval are relevant to this case.

A new drug, called a "pioneer" or "innovator" drug, must go through an arduous approval process with the FDA.[23] New drugs involve new chemical entities ("NCE"). First, the drug will undergo laboratory and clinical testing. If the results

---

[17] JX 243 at 11, 27.

[18] Tr. 250:22–260:5 (Ng).

[19] PTO ¶ 22; Tr. 261:5–15 (Ng).

[20] PTO ¶ 14.

[21] JX 492 at 68.

[22] PTO ¶ 15.

[23] Tr. 468:21–22 (Mack) (stating that NCEs cost approximately $150,000,000 to develop).

of those tests are promising, the sponsor will seek to conduct human clinical trials. To do so, it must file and the FDA must approve an investigational new drug application ("IND"). If the IND is approved, the drug will enter into a three-phase investigatory testing process. The three phases ramp up testing in terms of scope and intensity, with the first stage seeking early evidence of effectiveness by studying the drug's effect on twenty to eighty volunteers and the final stage typically involving up to several thousand human subjects. *See Smart Loc. Unions & Councils Pension Fund v. BridgeBio Pharma, Inc.*, 2022 WL 17986515, at *2 n.16 (Del. Ch. Dec. 29, 2022), *aff'd*, 2023 WL 5091086 (Del. Aug. 9, 2023) (ORDER); *see also* 21 C.F.R. § 312.21. The sponsor will then submit a new drug application ("NDA") to the FDA that includes "full reports of all clinical investigations, relevant nonclinical studies, and any other data or information relevant to an evaluation of the safety and effectiveness of the drug product obtained or otherwise received by the applicant from any source." *Mut. Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472, 476 (2013) (internal quotations omitted). Only if the drug is "safe for use" under "the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof" will it be approved. 21 U.S.C. § 355(d).

Second, a sponsor may seek approval of a generic version of an already approved drug. Once a pioneer drug has been approved, and subject to certain waiting periods, a drug's sponsor can file an abbreviated new drug application

6

("ANDA"). The ANDA process allows the FDA to approve generic versions of a previously approved pioneer drug. Because the pioneer drug's sponsor has already convinced the FDA that the drug's formula and packaging are safe and effective for human use, the sponsor of a generic drug candidate must establish that its product is equivalent to the approved drug. *See Takeda Pharms., U.S.A., Inc. v. Burwell*, 78 F. Supp. 3d 65, 71 (D.D.C. 2016) (explaining that a generic drug's sponsor must "show that its drug has the same relevant characteristics (including, *inter alia*, the same labeling, active ingredient, route of administration, dosage form, strength, and bioequivalency)"). If the generic version is sufficiently similar to the approved pioneer drug, the FDA may approve it without requiring the more rugged process for pioneer drugs.

The third pathway is referred to as the 505(b)(2) pathway. "Under § 505(b)(2) of the [Federal Food Drug and Cosmetic Act or 'FDCA'], a drug manufacturer may file an NDA for a drug that is not entirely new but is not simply a generic version of a branded drug." *Ethypharm S.A. France v. Abbott Lab'ys*, 707 F.3d 223, 227 (3d Cir. 2013). The approved drug on which the application is based is referred to as the "Reference Listed Drug" ("RLD") or colloquially as the "comparator" or "bioequivalent." Under this pathway, the sponsor may rely on the clinical studies focused on the RLD, rather than independently undertaking clinical studies. *Takeda*, 78 F. Supp. 3d at 72. A drug sponsor using the 505(b)(2) pathway is required to

produce data establishing that the differences between the original drug and the 505(b)(2) drug do not affect the 505(b)(2) drug's safety and efficacy. *Ethypharm S.A.*, 707 F.3d at 227.

The final step of the 505(b)(2) process is to file an NDA with the FDA. If the FDA is unsatisfied with the application, it may issue a "complete response letter" at the conclusion of the review period. 1 Food and Drug Admin. § 13:28 (2022-2). "The letter will describe specific deficiencies and, when possible, will outline recommended actions the applicant might take to get the application ready for approval." *Id.* The complete response letter is not necessarily a rejection, but rather "afford[s] applicants the opportunity to provide additional information before the agency makes a final decision on the application." *Nostrum Pharms., LLC v. U.S. Food & Drug Admin.*, 35 F.4th 820, 825 (D.D.C. 2022). The applicant may choose to cut its losses and withdraw its application, submit its application with additional information, or choose to stand on its application. *Id.* at 827.

An NDA must include proposed labeling for the drug. The proposed labeling will include an "Indication and Usage" section. When the FDA approves a drug, it will be approved only for certain "indications."[24] An indication describes the disease or condition, or symptoms thereof, for which an approved drug may be marketed.

---

[24] *See* Tr. 383:24–384:4 (Khemani) ("[W]hen a company develops their product, they develop for an indication. So all the clinical trials are done for that indication. And once they submit the data, then the FDA approves them for use for that indication.").

The indication may include a certain population of people for which the drug is approved. For example, Lidoderm is indicated "for relief of pain associated with post herpetic neuralgia" and is contraindicated for "patients with a known history of sensitivity to local anesthetics of the amide type."[25] To market an existing drug for a new use, a drug's sponsor must submit a supplemental new drug application ("SNDA") that justifies the labeling change proposed and supports the safety and effectiveness of the drug for the new indication. *Otsuka Pharm. Co., Ltd. v. Burwell*, 2015 WL 3442013, at *1 (D. Md. May 27, 2015).

Physician prescriptions or patient uses of a drug that fall outside of the approved indications are referred to as "off-label." "While physicians may prescribe drugs for off-label uses, drug manufacturers are forbidden to market drugs for off-label uses." *Oklahoma Firefighters Pension & Ret. Sys. v. Corbat*, 2017 WL 6452240, at *24 (Del. Ch. Dec. 18, 2017). The FDA recently clarified that a company "would not be regarded as intending an unapproved new use for an approved drug based solely on that firm's knowledge that such [drug] was being prescribed or used by health care providers for such use." 21 C.F.R. § 201.128.

---

[25] *See* FDA, *Lidoderm*, https://www.accessdata.fda.gov/drugsatfda_docs/label/2018/020612s014lbl.pdf.

## C.    ZTlido

ZTlido is a "lidocaine product that delivers pain relief through a transdermal patch applied to the skin."[26] ZTlido's comparator product was Lidoderm.  Lidoderm is a lidocaine patch launched in 1999 to treat post-herpetic neuralgia ("PHN"), commonly referred to as shingles pain.  Scilex forecasted that as of 2012, there would be a $1.25 billion market for transdermal lidocaine applications.[27]  Because Lidoderm had already been approved, Scilex was able to undertake the abbreviated 505(b)(2) pathway for approval of ZTlido as a prescription drug.[28]  Like Lidoderm, ZTlido is indicated only for PHN.[29]  ZTlido is a branded, prescription product.

When Scilex first acquired a license to the ZTlido technology, it had not yet filed an IND application.[30]  In order to ready the drug for approval, Scilex enlisted Dr. Jeffrey Gudin and Shawn Sahebi as consultants.[31]  Scilex also recruited Kip Vought, a regulatory consultant, to be Scilex's vice president of research and development.[32]

---

[26] PTO ¶ 13.

[27] JX 43 at 15.

[28] Tr. 194:19–195:5 (Vought).

[29] *Id.* at 9:20–21 (Ji).

[30] JX 43 at 8.

[31] Tr. 554:3–554:10 (Mack); *id.* at 661:12–18 (Sahebi).

[32] *Id.* at 191:20–23 (Vought).

10

Scilex sought FDA approval of the 1.8% version of ZTlido.[33] Scilex initially planned to launch ZTlido in the last quarter of 2015.[34] However, Scilex received a complete response letter from the FDA in mid-2016.[35] After resubmitting its NDA, ZTlido reached the market in October 2018 and has since been steadily increasing in sales.[36] Scilex's primary marketing strategy is to position ZTlido as a compatible add-on to another medication indicated for PHN, gabapentin.[37] Gabapentin accounts for 60 million annual prescriptions, a much larger market than the three million prescriptions incurred by lidocaine patches.[38] Scilex also boasts many off-label uses of ZTlido, which include treatment for lower back pain, neck pain, and hypertension.[39] Whether an insurance company will approve and cover the cost of the prescription of ZTlido depends on the insurer's policy.[40]

---

[33] *Id.* at 29:7–14 (Ji).

[34] JX 43 at 8.

[35] Tr. 202:19–203:6 (Vought).

[36] In 2019, annual sales of ZTlido were about $35 million. Sales increased to $48 million in 2020 and to $64 million in 2021. At the time of trial, sales were projected to reach between $90–92 million in 2022. *Id.* at 384:7–14 (Khemani).

[37] *Id.* at 385:12–386:1.

[38] *Id.*

[39] JX 466. ZTlido is prescribed to treat lower back pain 40% of the time, whereas it is only prescribed to treat PHN 4% of the time. The remaining 56% of prescriptions are for various types of neuropathic pain indications. Tr. 388:2–21 (Khemani); JX 457.

[40] Some insurers, like CVS Caremark and Medi-Cal, will reimburse the insured for ZTlido regardless of what indication it is prescribed for. Others may be more restrictive, and may require the patient to receive a prior authorization or take other steps before reimbursing the prescription, or may deny coverage to the prescription. Tr. 399:14–400:14 (Khemani).

### D. Sorrento Acquires Scilex

On August 2, 2016, Sorrento and Scilex executed a binding term sheet reflecting Sorrento's agreement to acquire a majority stake in Scilex.[41] The acquisition was effectuated through a stock purchase agreement (the "SPA") between Sorrento and former stockholders of Scilex, including Mack. The transaction closed on November 8, 2016, with Sorrento paying about $50 million for a seventy-two-percent stake in Scilex.[42] The SPA provided for milestone payments to be made when the FDA accepted Scilex's resubmitted NDA for ZTlido and when the FDA approved ZTlido for commercialization.[43] Mack initially received $12 million for his Scilex equity.[44] Following the acquisition, Mack was asked to stay on as Scilex's President. Scilex's post-acquisition board was made up of Dr. Ji, Jaisim Shah, David Deming, and Toshani Hidekuma.[45]

### 1. Restrictive Covenants Agreement.

On November 8, 2016, Mack entered into a Restrictive Covenants Agreement ("RCA") with Sorrento pursuant to the SPA.[46] The RCA restricts Mack from

---

[41] JX 142 at 6–7.

[42] JX 186.

[43] JX 179 § 1.3(a)–(b).

[44] *Id.*

[45] *See* JX 231 at 2.

[46] JX 185.

12

engaging in competitive conduct for a two-year period following closing (the "Restrictive Period"). During the Restrictive Period:

> Mack shall not, directly or indirectly, anywhere in the world, have any Relationship (as defined in Section 4) with any Business Entity (as defined in Section 4) (other than the Company, any of its subsidiaries or affiliates or Scilex), in the course of which Relationship Covenantor engages in or assists such Business Entity, directly or indirectly, with respect to any activity that is directly or indirectly competitive with (a) the Product or any business related to the Product in which Scilex engages in as of the closing date of the Purchase (the "Closing Date"), or (b) any other business related to the Product that Scilex enters into while Covenantor provides or has provided services as an employee, independent contractor or consultant of Scilex (each, a "Competing Business"), in each case without the prior written consent of the Company.[47]

The "Product" is defined as "that certain valuable product, product candidate and technology known as Ztlido (lidocaine patch 1.8%)."[48] The RCA also restricts Mack from directly or indirectly soliciting, inducing, or attempting to induce any employee or consultant to leave the employ of or cease services to Sorrento or Scilex.[49]

Early drafts of the RCA also included restrictions for activities competitive with D2T, a diclofenac product formerly in Scilex's pipeline. The reference to that product was removed at Pedranti's request.[50] Before Mack signed the final RCA,

---

[47] *Id.* § 2. The Restrictive Period is tolled in the event of breach until the breach is resolved. *Id*. § 3(d).

[48] *Id.* at 1.

[49] *Id.* § 1.

[50] JX 157 at 3.

Mack discussed the scope of the agreement with Pedranti and a Scilex lawyer. Pedranti asked the attorney what "directly or indirectly" compete would capture in terms of competitive activity.[51] Pedranti confirmed his understanding that indirect competition "would be any other pain product that could be used as an alternative or vice versa to Ztlido?"[52] Both Pedranti and Mack ultimately agreed to the RCA with these restrictions.

## 2. Employment Agreement

On November 1, 2016, Mack signed an offer letter to become the President of Scilex.[53] As required under the offer letter, Mack had executed Sorrento's Proprietary Information and Inventions Agreement on October 25, 2016.[54] Section 3 of the Proprietary Information and Inventions Agreement provided that all materials produced in connection with Mack's employment are Scilex's sole property and "shall be returned promptly to the Company as and when requested by

---

[51] JX 163 at 4. The attorney responded: "It's a little hard to say. Probably if a breach were alleged, that's the kind of thing that would get litigated (or in this case arbitrated). 'Directly or indirectly' is pretty commonly used in these sorts of agreements. I suppose the intent is to give the buyer somewhat wider latitude in claiming that some alleged competitive activity does in fact constitute competition. For example, if they were to allege that you or Tony did something that 'competes' with the product, they might still have an argument even if the activity relates to an alternative product that could not be said to be a 'direct' competitor." *Id.* at 3.

[52] *Id.* at 2.

[53] PTO ¶ 28.

[54] JX 174 at 12.

the Company. Should the Company not so request, I shall return and deliver all such property upon termination of my employment, and I will not take with me any such property or any reproduction of such property upon such termination."[55]

In executing the offer letter, Mack agreed to be bound to Sorrento's Code of Business Conduct and Ethics for Employees, Executive Officers and Directors ("Code of Conduct").[56] The Code of Conduct required Mack to avoid conflicts of interest such as being employed by or owning a significant interest in a competitor of Sorrento. It also prohibited Mack from taking personal advantage of corporate opportunities presented to or discovered by him as a result of his employment by Sorrento, required Mack to protect Sorrento's assets, including its data, and obligated him to refrain from using or disclosing Sorrento's confidential information.[57]

### E. Mack Forms Virpax

On November 1, 2016, the same day that Mack signed his offer letter to remain on as President of Scilex, he formed Virpax Pharmaceuticals, LLC ("Virpax LLC") as a Delaware limited liability company. Mack formed Virpax

---

[55] *Id.* at 6.

[56] *Id.* at 30–45.

[57] *Id.*

15

Pharmaceuticals, Inc., the defendant in this case, on May 12, 2017. Virpax LLC owns a 20% interest in Virpax.[58]

### F. Pipeline Products

As Scilex's President, Mack was responsible for identifying promising products for licensing and commercialization. Mack had full authority to pursue pipeline products, but he needed Sorrento's approval to execute a final term sheet or binding agreement.[59]

Certain products were already in Scilex's pipeline before the acquisition by Sorrento closed in November 2016. A September 2016 presentation indicated that Scilex was exploring an SNDA to expand the proposed approval of ZTlido to include 3.6% and 5.4% formulations indicated for PHN.[60] Scilex was also considering submitting a separate NDA requesting approval of 3.6% and 5.4% formulations of ZTlido indicated for chronic lower back pain.[61] At that time, Scilex was also contemplating undertaking the development of a 3% diclofenac patch.[62] The envisioned patch would be eligible for a 505(b)(2) pathway to approval, as it would

---

[58] JX 555 at 100.

[59] Tr. 29:20–30:21 (Ji).

[60] JX 150 at 6.

[61] *Id.* at 7. This proposed NDA would cross reference the NDA filed for a PHN indication.

[62] *Id.* at 8–11.

use the existing "Flector Patch" as its Reference Listed Drug.[63]  The Flector Patch was a diclofenac patch developed by Pfizer.[64]  The product described below as "LC400" was also included in the September 2016 presentation.

### 1.    Epoladerm

On August 24, 2016, Andy Muddle, the chief operating officer of MedPharm contacted Mack, Pedranti, and Vought, expressing interest in a potential collaboration between Scilex and MedPharm.[65]  MedPharm is an R&D and manufacturing company in the United Kingdom and North Carolina that focuses on topical sprays, foams, and gels.[66]  On September 29, 2016, Mack informed Pedranti that he had met with the president of MedPharm.[67]  In the email, Mack wrote, "Let's not introduce them to Sorrento."[68]

MedPharm presented a diclofenac spray foam technology to Mack.  Through later investigation, Mack determined that the active ingredient in MedPharm's product, diclofenac, was banned in the United States and was only approved in Europe as an over the counter ("OTC") product.[69]

---

[63] *Id.* at 10.

[64] *See* JX 43 at 40.

[65] JX 133.

[66] Tr. 471:12–14 (Mack).

[67] JX 133.

[68] *Id.*

[69] Tr. 472:2–9 (Mack).

On October 3, 2016, the CEO of MedPharm and his executive assistant followed up on the conversation with Mack via email, attaching a presentation and MedPharm's standard confidentiality agreement.[70] Mack forwarded the emails to Lisa McDiarmid, a Scilex employee, and asked her to review the proposed confidentiality agreement.[71] Pedranti was copied on this email.[72] Later in the same chain, McDiarmid asked Mack whether the entity executing the confidentiality disclosure agreement ("CDA") should be Troy, IACTA, or Scilex.[73] Mack responded that the CDA should be with Troy.[74] MedPharm and Troy executed a Mutual Confidentiality Agreement on October 12, 2016.[75]

MedPharm and Virpax LLC entered a similar agreement, also dated October 12, 2016.[76] Thereafter, MedPharm and Virpax began discussing a potential term sheet for a collaboration on a potential spray application pain management product. On February 26, 2017, Mack emailed MedPharm executives and indicated that

---

[70] JX 158 at 3–5. These emails were sent to Mack's Scilex email address.

[71] *Id.* at 2.

[72] *Id.* Damon Burrows was also copied on emails in this chain.

[73] *Id.* at 1.

[74] *Id.*

[75] PTO ¶ 22.

[76] JX 195. MedPharm delivered the fully executed agreement to Virpax LLC on November 21, 2016. *Id.*

Virpax would like to move forward with both diclofenac and lidocaine products.[77] A few days after, Mack sent a powerpoint presentation to MedPharm executives describing Virpax's corporate structure.[78] The powerpoint presentation identified Mack as the President and CEO of Virpax[79] and described it as "a privately held specialty pharmaceutical company headquartered in Malvern, PA[,] focused on the development and commercialization of late-stage transdermal and liposomal products with a main focus on the treatment of pain."[80] In June 2017, Mack created a target product profile ("TPP") for the diclofenac spray product by making alterations to a draft TPP that Scilex had created for its proposed diclofenac patch.[81] Mack also instructed a Scilex consultant, Shawn Sahebi, to produce a net present value analysis of the diclofenac and lidocaine film sprays.[82]

On April 11, 2017, Virpax entered into an option agreement to obtain an exclusive worldwide license for MedPharm's MedSpray technology.[83] On June 6,

---

[77] JX 230 at 1.

[78] *Id.* The powerpoint presentation identifies Mack and four others as the Virpax board of directors. *Id*. at 12. But Virpax was not incorporated until May 12, 2017. JX 254.

[79] *Id.* at 11–12.

[80] *Id.* at 6. The powerpoint also stated that "VIRPAX is pursuing patentable 505(b)(2) pathways via its proprietary portfolio of patented molecules that will challenge current branded and generic molecules in its class." *Id.*

[81] JX 258; JX 258A; Tr. 656:13–657:22 (Mack).

[82] JX 238.

[83] PTO ¶ 23.

2017, Virpax exercised that option and thereafter began developing the MedSpray technology as "Epoladerm."[84] At the time of trial, Epoladerm had not yet been FDA approved and therefore was not available for sale. Virpax has announced that it will pursue a direct-to-OTC regulatory approval pathway for Epoladerm.[85]

### 2. Probudur

Vought introduced LipoCure, an Israeli drug development company, to Scilex in November 2015.[86] Representatives of LipoCure indicated that they would be open to discussing collaboration arrangements with Scilex and suggested the company check out a product called LC400. Mack, Pedranti, and Vought met with representatives of LipoCure in late 2015.[87] LipoCure and Scilex signed a non-disclosure agreement in early January 2016.[88]

LC400 was a liposomal bupivacaine in a stabilizing gel indicated for post-operative analgesia. LC400 was similar to an existing product called "Exparel," a post-operative pain drug produced by Pacira. Whereas Exparel could treat post operative pain for up to 24 hours, initial studies of LC400 indicated that it could last

---

[84] *Id.*

[85] *Id*.

[86] JX 78 at 2–3.

[87] *See* JX 78; Tr. 459:15–460:9 (Mack).

[88] JX 88 at 2.

up to 96 hours.[89]  After receiving a confidential presentation about the features of LC400, Vought indicated that they were "very interested in this program."[90]  Vought forwarded communications with LipoCure to Mack and Pedranti.[91]  Mack chimed in with his approval:  "Love the market and the product.  This is a big deal once we make it happen."[92]  Addressing Pedranti, Mack asked if "we can get an LOI in place?  I would like to add this to our development pipeline."[93]

In July 2016, Pedranti, Mack, Vought, and Burrows met with LipoCure's founder, Chezy Barenholz, to discuss potentially licensing LC400.[94]  Scilex and LipoCure began to discuss what an in-licensing agreement between the two entities could look like.[95]  On August 30, 2016, Ng copied Ji on an email attaching a proposed term sheet for a deal with LipoCure.[96]

---

[89] Tr. 455:22–456:9 (Mack); JX 591 at 51.

[90] JX 92 at 9.

[91] *Id.* at 2.

[92] *Id.* at 1.

[93] *Id.*

[94] JX 126.

[95] *See, e.g.*, JX 131.

[96] JX 136.  Ng noted that the business and financial terms were missing from the attached term sheet.  *Id.*  Pedranti responded the same day to Ng, Mack, and Ji attaching a term sheet with proposed financial terms.  *Id.*  The next day, Mack followed up with Ji to schedule a call to discuss the LipoCure project.  JX 140.  It does not appear that Ji responded to either email.

LC400 was identified as a Scilex pipeline product in a September 2016 presentation.[97] The presentation indicated that the approval pathway for LC400 was a 505(b)(2) pathway, using Exparel as its Reference Listed Drug. In October 2016, Mack, Pedranti, and Burrows traveled to Israel to meet with Barenholz.[98]

On November 4, 2016, Mack emailed Pedranti indicating that Scilex would not be moving forward with LC400.[99] Mack testified that one of the reasons for passing on the opportunity with LipoCure was to focus on ZTlido.[100] He also mentioned a bupivacaine formulation that Ji and another Sorrento scientist, Hui Xie, had been developing concurrently with Mack's negotiations with LipoCure.[101]

On January 5, 2017, Mack emailed Barenholz, indicating that he was "uncertain of [Scilex's] new board's willingness to commit to LC400."[102] He wrote that he planned to meet with Ji and Ng the following week and would return with

---

[97] JX 150.

[98] JX 148.

[99] Mack sent the following to Pedranti: "We should let Kip know we are not moving forward with LC 400. He may want to give [Barenholz] a heads up. Henry wants to develop his bupivacaine. I don't blame him." Pedranti replied: "Neither do I. Should we see what Henry has first before letting [Barenholz] know?" Mack responded: "I am not sure how we evaluate with completing work in animals. Henry[] believes his bupivacaine is stable. [Barenholz] will begin to lo[]se patience so[oner] or later, i[f] we wait to[o] long." JX 177.

[100] Tr. 457:2–6 (Mack).

[101] *Id.* at 464:1–11.

[102] JX 530 at 3.

more information.[103]  On January 25, 2017, Mack followed up with Barenholz, stating:

> We learned that Sorrento will only allocate funding to manage operations that support the development[] resubmission and commercialization of Ztlido.  Hence, we will not have the resources to commit to new product development at this time.  We will continue to update our business case for LC 400 so we are in the best position to support the development LC 400 once Ztlido is approved or we receive additional funding.[104]

LipoCure's CFO responded, asking Mack to let him know when they could reengage with LC400 and indicating that they were "looking forward to a successful cooperation in the future."[105]

On March 21, 2017, Mack emailed Barenholz:  "Since Sorrento is not allowing SCILEX to commit to the LC400 development project, I have another plan I would like to discuss with you."[106]  This email was sent from Mack's personal

---

[103] *Id.*

[104] *Id.* at 2.  Mack was questioned at trial about the source of his knowledge that Sorrento was unwilling to pursue the LC400 opportunity.  He clarified he did not speak to Ji, Sorrento's Chairman and CEO, or Ng, Sorrento's general counsel, about passing on LC400.  Tr. 579:8–15 (Mack).  He testified that he did speak to Pedranti, but then backpedaled when confronted with his deposition testimony, in which he was uncertain of whether he spoke to Pedranti on the subject.  *Id.* at 579:18–581:11.  Pedranti stated at his deposition that he did not know what Mack meant when Mack said that Sorrento will only allocate funding to ZTlido.  Pedranti Dep. 85:8–17.  Outside of the email to Barenholz, Mack could identify no document indicating that Ji, Ng, or Pedranti had informed him that Sorrento could not fund LC400.  *Id.* at 581:12–582:2 (Mack).

[105] JX 530 at 1.

[106] JX 240 at 2.

email address.[107]  Mack and Barenholz put plans in place to meet in New York on May 24 and, now operating from his Virpax email address, Mack instructed Panzarella to forward a CDA to Barenholz.[108]

On July 6, 2017, Vought sent Xie a copy of the target product profile that Scilex had created for LC400.[109]  Vought's email noted that Scilex had "abandoned" LC400 after learning of Xie's formulation of a similar product.[110]  Xie's replacement product was not ultimately developed by Scilex.[111]

LipoCure and Virpax executed a CDA and a term sheet for LC400.[112]  On March 19, 2018, Virpax entered into a license agreement with LipoCure to license LC400.[113]  Under the license agreement, Virpax is developing LC400 into "Probudur," a non-opioid pain management drug that will be indicated for local post-operative surgical pain.  At the time of trial, Probudur was in preclinical animal testing.

---

[107] *Id.*

[108] *Id.* at 1.

[109] JX 273 at 1.

[110] *Id.*

[111] Tr. 464:1–11 (Mack).

[112] *See* JX 240; Tr. 202:10–22 (Mack); JX 536.

[113] PTO ¶ 17.

### 3. Envelta

In January 2016, Mack and Pedranti met with executives from Nanomerics in San Francisco.[114] The chief scientific officer of Nanomerics, Dr. Ijeoma Uchegbu, followed up by email, attaching Nanomeric's corporate presentation and reiterating the plan to follow up by phone and to meet up in London in February 2016.[115]

Mack, Ng, and Burrows would end up meeting with Nanomerics in October 2016 to learn about Nanomeric's technology for delivering cyclosporine to the eye to combat dry eye.[116] Mack and Pedranti strategically excluded Ji from this meeting, stating that "We don't want [Ji] at Nanomerics."[117] Mack testified that he was not considering this product as a development opportunity for Scilex, which was pain focused, but rather diverted the opportunity to IACTA, a company formed for the purpose of pursuing eye care products.[118]

In 2018, IACTA reengaged with Nanomerics.[119] During a dinner meeting, Nanomeric's Dr. Uchegbu brought up a product called NM-0127. Mack did not

---

[114] JX 91; PTO ¶ 18.

[115] *Id.*

[116] Tr. 465:15–24 (Mack); JX 135.

[117] JX 135.

[118] Tr. 466:1–18 (Mack). The opportunity was first diverted to Troy, but was later transferred to IACTA. *Id.* The cyclosporine dry eye product was not ultimately developed by IACTA.

[119] *Id.* at 468:2–469:23.

express immediate interest in developing NM-0127, as it was presented as an NCE product that would have to undergo the entire, costly NDA process.[120]  In March 2018, Mack reached out to Nanomerics, requesting a confidentiality agreement so that he could evaluate the product for potential 505(b)(2) pathways.[121]  Virpax and Nanomerics entered into a CDA on March 19, 2018.[122]  On April 11, 2019, Virpax entered into a license agreement with Nanomerics for the NM-0127 product, which would eventually be branded as "Envelta."[123]

Envelta is a nasal spray that delivers encephalin, a non-opioid pharmaceutical product, to delta receptors in the brain in order to provide full body pain relief. Envelta was in preclinical animal testing at the time of trial, and Virpax intends to seek FDA approval for Envelta with an indication for acute and chronic pain associated with cancer.[124]

---

[120] *Id.*

[121] *Id.*

[122] PTO ¶ 20.

[123] *Id.*

[124] *Id.*

### G. Mack Resigns

On March 12, 2018, Mack resigned as CEO of Scilex effective March 16, 2018.[125] Ng replied to Mack's notice of resignation:

> As part of the transition, we are hoping that you will consider a consultation arrangement to make the transition go smoothly. You have much industry and institutional knowledge that would be helpful. That aside, although it goes without saying, I need to remind you of your past and ongoing confidentiality and non-compete obligations associated with the Scilex sale agreements and under various agreements as an employee of Scilex.[126]

Ng later replied, apologizing for being so formal and indicating that he would call him the next day. Mack replied to Ng, indicating that Ng had requested Mack's resignation and asking "What non-competes are you[] talking about ?"[127]

Virpax, with Mack at the helm, continues to develop Epoladerm, Probudur, and Envelta (the "Pipeline Products"), which all remain preclinical. The FDA has not yet approved any of the Pipeline Products. None of the Pipeline Products are currently available for sale.

---

[125] JX 302 at 2. Mack testified that he resigned after being informed by Pedranti that Ji sought to terminate his position. Tr. 475:24–476:12 (Mack). Ji testified that he never asked Mack for his termination. *Id.* at 37:12–16 (Ji). Whether Mack was asked to leave or terminated his employment of his own volition does not affect the merits of this case, and the court need not resolve these conflicting narratives.

[126] *Id.* at 1.

[127] *Id.*

## H. Mack Deletes Evidence After Being Sued

Less than a month after Plaintiffs filed their complaint in this action, on April 15, 2021, Mack deleted hundreds of documents from his USB device.[128] Many of these documents relate to Scilex.[129] Of the 485 files and folders deleted on this occasion, 213 mentioned "Scilex," "Sorrento," "ZTlido" or "ZTL" in the file or original folder name.[130] Mack confirmed at trial that he was aware by April 15 that he was required to preserve information relevant to this litigation.[131] At trial, Mack attempted to obscure the clear inference to be drawn from the facts presented by arguing that anyone in his family could have accessed the USB.[132] Even the most gullible reader would not believe that anyone other than Mack deleted these files, which were deleted in 26 separate actions over a 20-minute period.[133]

---

[128] JX 572.

[129] *See, e.g., id.* at l. 230 (marking the deletion of a document titled "SCILEX_INTRODUCTION_LIDODERM_Tape Survey and Reimbursement tm.pptx"); *id.* at l. 239 (indicating the deletion of a document titled "Scilex Business Overview  L2T 6.doc"); *id.* at l. 292 (indicating the deletion of a document titled "Scilex Business Overview.doc").

[130] JX 581 ¶ 57. Of these, 213 files and folders, 177 were created between 2013 and 2014, while Mack was employed at Scilex. *Id.*

[131] Tr. 639:7–10 (Mack).

[132] *Id.* at 638:6–11.

[133] JX 572; JX 581 ¶ 58.

Mack also deleted large swathes of email communications regarding Scilex, including all personal Gmail messages between October 2016 and March 2018.[134] Discovery revealed that Mack used that account to communicate about the Pipeline Products and other Scilex business.[135] Mack could not explain why his emails or the USB's contents had been deleted.[136] Mack manually deleted documents and emails relevant to this case.

## I.    Procedural History

Plaintiffs filed their original complaint on March 21, 2021.[137] Plaintiffs filed amended complaints on May 7, 2021;[138] September 17, 2021;[139] and April 1, 2022.[140] The operative complaint includes nine counts, including claims for breach of the RCA and the employment agreement, tortious interference with those contracts, tortious interference with prospective economic advantage, breach of fiduciary duty, aiding and abetting, and misappropriation of trade secrets.

---

[134] Tr. 700:4–702:6 (Faulkner); JX 581 ¶ 89.

[135] JX 240 at 1–2.

[136] Mack Dep. 379:24–380:3; *id.* at 384:16–19.

[137] Dkt. 1.

[138] Dkt. 28.

[139] Dkt. 91.

[140] Dkt. 138.

The court held a three-day trial from September 12 to September 14, 2022. There were over 800 trial exhibits. Seven fact witnesses and four experts testified at trial. The parties also submitted deposition transcripts from 22 witnesses.[141]

Plaintiffs' expert, Dr. Lakdawalla, provided an opinion regarding the measure of damages suffered by the Plaintiffs. Dr. Lakdawalla is an expert in health economics and health policy.[142] Assuming liability and commercialization of Epoladerm, he calculated Scilex's lost profit damages for breach of contract as between $1,686,785 and $14,684,433.[143] Calculating the same assuming a two-year delay in the commercialization of Epoladerm, he estimates lost profit damages as between $874,038 and $7,608,988.[144] For the fiduciary duty claims, he calculates unjust enrichment damages for the misuse of Scilex resources at $1,363,045 and endorses the use of a running royalty as a percentage of shares to compensate for the theft of corporate opportunities.[145] Finally, as to the trade secret misappropriation damages, Dr. Lakdawalla calculates unjust enrichment damages at $6,709,694, reasonable royalty damages between $5,978,807 and $6,709,694, and, assuming a

---

[141] Prior to trial, Defendants moved to exclude the opinions of two of Plaintiffs' experts, Dr. Anita Gupta and Dr. Darius Lakdawalla. The court denied both motions. Plaintiffs ultimately decided not to present Dr. Gupta's testimony at trial.

[142] JX 638 at 4.

[143] *Id.* at 7.

[144] *Id.*

[145] *Id.*

47-month delay in commercializing Epoladerm, lost profit damages between $1,448,013 and $12,708,522.[146]

Defendants counter with their damages expert, Dr. Richard Manning. Dr. Manning is an economist with extensive history at multinational pharmaceutical companies.[147] Dr. Manning criticizes the assumptions of Dr. Lakdawalla's report, adjusting his breach of contract damages down to $27,465 and $72,447 for no launch of Epoladerm, and between $15,139 and $39,933 for a two-year delay in Epoladerm's launch.[148] As for the trade secret misappropriation damages, Manning argues that they are more accurately stated as between $24,044 and $63,425.[149]

Defendants also presented Dr. Maunak Rana, a practitioner and professor in anesthesiology and interventional pain management.[150] Dr. Rana was tasked with comparing ZTlido with Probudur, Envelta, and Epoladerm in order to determine each product's substitutability.[151] Dr. Rana concluded that ZTlido and the Pipeline Products are highly differentiated and therefore not competitive.[152] Plaintiffs did not present Dr. Anita Gupta, their competing expert on this topic, at trial.

---

[146] *Id.* at 8.

[147] JX 617 at 6.

[148] *Id.* at 105–06.

[149] *Id.* at 106.

[150] JX 591 at 3.

[151] *Id.* at 4–5.

[152] *Id.* at 100–01.

Finally, Plaintiffs presented Kevin Faulkner, a cybersecurity consultant, to testify regarding Mack's potential destruction of digital evidence.[153] Faulkner analyzed Mack's devices and concluded that he likely manually deleted certain Gmail messages dated prior to April 19, 2018.[154]

The parties completed post-trial briefing and presented post-trial argument on January 20, 2023. On February 13, 2023, Sorrento commenced voluntary proceedings under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas.[155]

## II. ANALYSIS

### A. Count I: Breach of Contract

Count I alleges that Mack breached the RCA by negotiating with and retaining licenses from MedPharm, LipoCure, and Nanomerics on behalf of Virpax. The RCA is governed by California law.[156] Under California law, the elements of a cause of action for breach of contract are: "(1) the existence of the contract, (2) plaintiff's

---

[153] JX 581 at 4.

[154] *Id.* at 47.

[155] *See* Dkt. 234.

[156] JX 185 § 5(i)(i). *See also Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1161 (Del. 2010) ("Delaware Courts will honor 'a contractually designed choice of law provision so long as the jurisdiction selected bears some material relationship to the transaction.'") (quoting *J.S. Alberici Constr. Co. v. Mid–West Conveyor Co., Inc.*, 750 A.2d 518, 520 (Del. 2000)); *Focus Fin. P'rs, LLC v. Holsopple*, 250 A.3d 939, 959 (Del. Ch. 2020) ("This court has recognized consistently that California has a fundamental public policy against non-competition and non-solicitation provisions and that California has a materially greater interest in that policy than Delaware's interest in promoting freedom of contract.").

performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman*, 250 P.3d 1115, 1121 (Cal. 2011).

California law generally prohibits non-competition agreements, but an agreement not to compete may be valid if made in connection with a sale of all or substantially all of assets of a business, including its goodwill.[157] The parties do not dispute the enforceability of the RCA. Nor do they dispute that Sorrento fully performed under the contract. Rather, the parties disagree as to whether Mack's conduct constituted competition, directly or indirectly, with ZTlido in violation of the RCA.

The first step in this analysis requires review of the parties' contract. "When a dispute arises over the meaning of contract language, the first question to be decided is whether the language is 'reasonably susceptible' to the interpretation urged by the party. If it is not, the case is over. . . . If the court decides the language is reasonably susceptible to the interpretation urged, the court moves to the second

---

[157] Cal. Bus. & Prof. Code § 16601 ("Any person who sells the goodwill of a business, or any owner of a business entity selling or otherwise disposing of all of his or her ownership interest in the business entity, or any owner of a business entity that sells (a) all or substantially all of its operating assets together with the goodwill of the business entity, . . . may agree with the buyer to refrain from carrying on a similar business within a specified geographic area in which the business so sold, or that of the business entity, division, or subsidiary has been carried on, so long as the buyer, or any person deriving title to the goodwill or ownership interest from the buyer, carries on a like business therein.").

question:  what did the parties intend the language to mean." *S. Cal. Edison Co. v. Superior Ct.*, 44 Cal. Rptr. 2d 227, 232 (Cal. Ct. App. 1995) (internal citations omitted).  "A contract is ambiguous when, on its face, it is capable of two different reasonable interpretations." *United Tchrs. of Oakland v. Oakland Unified Sch. Dist.*, 142 Cal. Rptr. 105, 110 (Cal. Ct. App. 1977).

The RCA prohibited Mack from "directly or indirectly . . . engag[ing] in or assist[ing] [any] Business Entity, directly or indirectly, with respect to any activity that is directly or indirectly competitive with . . . the Product or any business related to the Product in which Scilex engages."[158]  The "Product" is defined as a "certain valuable product, product candidate and technology known as Ztlido (lidocaine patch 1.8%)."[159]  Mack's obligations under the RCA ran for a period of two years, until November 2, 2018.  The RCA contains a tolling provision which states that "[i]n the event of any breach or violation by [Mack] of any of the Restrictive Covenants, the time period of such covenant with respect to [Mack] shall be tolled until such breach or violation is resolved."[160]

---

[158] JX 185 § 2.

[159] *Id.* at 1.

[160] *Id.* § 3(d).

### 1. What is competition?

The parties agree that Plaintiffs' breach of contract claim hinges on whether any of Virpax's Pipeline Products directly or indirectly compete with ZTlido.[161] The parties sharply disagree on what it means to compete. Plaintiffs argue that Virpax and its Pipeline Products compete with ZTlido because they take up market share in the pain product market and because the Pipeline Products could be prescribed for the same patients for which ZTlido currently is prescribed off-label.[162] Defendants maintain that a competitive product is one that could be considered substitutable with ZTlido by prescribing physicians or insurance payors. Defendants argue that the Pipeline Products are fundamentally different from ZTlido, that they cannot "compete" because they are not currently available on the market, and that Scilex itself does not consider the Pipeline Products competitive outside of the context of this lawsuit.[163]

---

[161] Defs.' Answering Br. 18; Pls.' Reply Br. 2–3.

[162] Plaintiffs' post-trial briefs do not offer a coherent definition of competition, but rather argue that the pipeline products are competitive with ZTlido because they may be used for some of the off-label uses of ZTlido and because Mack has described Virpax and Scilex as "direct competitors." Plaintiffs' Opening Br. 29–30.

[163] Defs.' Answering Br. 18–27.

"Competition" is defined as "the effort or action of two or more commercial interests to obtain the same business from third parties."[164]  Substitutability and competition for the same consumer groups are the integral considerations for most courts that have sought to define competition.  "Competitors are '[p]ersons endeavoring to do the same thing and each offering to perform the act, furnish the merchandise, or render the service better or cheaper than his rival.'" *Summit Tech. v. High-Line Med., Instruments, Co.*, 933 F. Supp. 918, 937 (C.D. Cal. 1996) (quoting *Fuller Bros., Inc. v. Int'l Mktg., Inc.*, 870 F. Supp. 299, 303 (D.Or. 1994)).  In *Stryker Corp. v. Bruty*, a court decided that two biotechnology companies were competitors when both "target the same customers, including specifically orthopaedic surgeons," "the technologies at issue are common to both companies," and the companies viewed each other as competitors.  2013 WL 1962391, at *5 (W.D. Mich. May 10, 2013).

The question of whether and to the degree to which products compete often arises in the context of trademark litigation.  The issue in the trademark context is whether two or more products are so competitively proximate that they may cause confusion in prescribing physicians.  *See Pfizer Inc. v. Astra Pharm. Prods., Inc.*,

---

[164] *Competition*, Black's Law Dictionary (11th ed. 2019).  "[D]ictionaries are the customary reference source that a reasonable person in the position of a party to a contract would use to ascertain the ordinary meaning of words not defined in the contract." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006).

858 F. Supp. 1305, 1325 (S.D.N.Y. 1994) (evaluating the proximity of products by considering their indications and potential prescribing substitutability). In determining whether two prescription drugs compete, "courts consider (1) whether the drugs are designed or marketed to treat the same medical conditions, diseases, etc., and (2) whether patients could be appropriately prescribed both of the competing drugs to treat those medical conditions, diseases, etc." *Ferring B.V. v. Fera Pharms., LLC*, 2016 WL 324972, at *4 (E.D.N.Y. Jan. 26, 2016). The relevant "customer" for whom pharmaceutical products compete in this context is the prescribing physician. *Id.* at *3 ("[W]here the allegedly competing products are prescription drugs, the proximity of the products inquiry looks to whether the prescribing **physician** would be confused as to the source of the products." (emphasis in original)); *Pfizer*, 858 F. Supp. at 1325.

A similar question regarding competition arises in false advertising suits when proximate causation is challenged.[165] Causation is often proved in the false advertising context by showing that the plaintiff's products compete with the

---

[165] The rationale behind false advertising suits has some strong parallels with California's policy for enforcing non-competition agreements in the context of the sale of businesses. *See* Edward S. Rogers, *The Law of Unfair Competition and Trade Marks*, 39 Yale L.J. 297, 299 (1929) (describing the prohibition on unfair competition as "[t]he right of a business man is to have full benefit of the reputation he has established, a part of which is the trade that, without interference, would normally flow to him; and the duty of others is to refrain from appropriating this reputation or doing anything to divert or obstruct the normal flow of trade which probably would result from it.").

defendant's. *ThermoLife Int'l LLC v. Sparta Nutrition LLC*, 2020 WL 248164, at *8–9 (D. Ariz. Jan. 16, 2020).[166] Competitors "vie for the same dollars from the same consumer group." *Kournikova v. Gen. Media Commc'ns, Inc.*, 278 F. Supp. 2d 1111, 1117 (C.D. Cal. 2003). When products are directly competitive, sales gained by one product are likely to be the same sales lost by the other product. *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 825–26 (9th Cir. 2011). This phenomenon occurs because directly competitive products are typically fully substitutable equivalents in many respects. By contrast, "different products in different markets [marketed] to different customer segments" are certainly not competitive. *ThermoLife*, 2020 WL 248164, at *9.

This principle was illustrated in *Scilex Pharmaceuticals Inc. v. Sanofi-Aventis U.S. LLC*, 2021 WL 11593043 (N.D. Cal. Aug. 16, 2021). In that case, Scilex sued sellers of OTC lidocaine patches for false advertising and false and misleading representations. Scilex alleged the OTC patches "directly compete with . . . Ztlido" and argued that the defendants' false representations about quality and effectiveness of their patches was harming Scilex's sales. *Id.* at *1. Scilex alleged that it competed

---

[166] *See also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 136 (2014) ("[T]he classic Lanham Act false-advertising claim [is one] in which one competitor directly injures another by making false statements about his own goods or the competitor's goods and thus inducing customers to switch. . . . But although diversion of sales to a direct competitor may be the paradigmatic direct injury from false advertising, it is not the only type of injury cognizable under § 1125(a)." (internal quotations omitted) (cleaned up)).

with the defendants "for consumers looking to purchase lidocaine patches that treat pain through the skin." *Id.* at *3. Defendants argued that the products were not competitive because defendants' products were sold over the counter, while Scilex's products were available by prescription only. *Id.* at *3–4. Scilex had pleaded that "Ztlido is regularly prescribed for the off-label use of treating general neuropathic pain – the same purpose for which OTC lidocaine patches are marketed and used." *Id.* at *4. Noting that the defendants' advertising drew direct comparisons between their products and prescription patches, the court found that the products were in competition for the same consumers despite the differences in their accessibility. *Id.*

California law broadly prohibits non-compete agreements subject to some exceptions. *Ixchel Pharma, LLC v. Biogen, Inc.*, 470 P.3d 571, 587 (Cal. 2020). The applicable exception here, for the sale of a business, only allows an agreement that causes the former owner of the business "to refrain from carrying on a similar business within a specified geographic area in which the business so sold . . . has been carried on."[167] The policy behind this exception is as follows:

> Section 16601's exception serves an important commercial purpose by protecting the value of the business acquired by the buyer. In the case of the sale of the goodwill of a business it is unfair for the seller to engage in competition which diminishes the value of the asset he sold. Thus, the thrust of section 16601 is to permit the purchaser of a business to protect himself or itself against competition from the seller which competition would have the effect of reducing the value of the property

---

[167] Cal. Bus. & Prof. Code § 16601.

right that was acquired. One of the primary goals of section 16601 is to protect the buyer's interest in preserving the goodwill of the acquired corporation.

*Strategix, Ltd. v. Infocrossing West, Inc.*, 48 Cal. Rptr. 3d 614, 616 (Cal. Ct. App. 2006) (internal citations omitted) (cleaned up). "The 'good will' of a business is the expectation of continued public patronage."[168] This exception is limited. "[I]n order to uphold a covenant not to compete pursuant to section 16601, the contract for sale of the corporate shares may not circumvent California's deeply rooted public policy favoring open competition." *Hill Med. Corp. v. Wycoff*, 103 Cal. Rptr. 2d 779, 786 (Cal. Ct. App. 2001). Despite the broad language in the RCA, the constraint on "direct and indirect competition" may only reach as far as "carrying on a similar business" to be enforceable under California law.

California courts interpret the "similar business" requirement to ensure that that there is actual competitive activity rather than "insubstantial and infrequent or isolated transactions." *Monogram Indus., Inc. v. Sar Indus., Inc.*, 134 Cal. Rptr. 714, 719 (Cal. Ct. App. 1976) (citations omitted). In implementing Section 16601, the California legislature intended its carveout to apply only to the "direct or indirect transaction or solicitation of substantial business activities in competition with the convenantee." *Swenson v. File*, 475 P.2d 852, 585 (Cal. 1970). The court in *Monogram* found that a similar business was carried on when the defendants

---

[168] Cal. Bus. & Prof. Code § 14100.

advertised that their product was born out of their prior experience with the purchased company and their product was conceptually identical to the purchased company's product. 134 Cal. Rptr. at 720.

With those concepts in mind, a competitive product under the RCA is one that competes for the same customers as ZTlido. Because the RCA is drafted to encompass both direct and indirect competition, it is not necessary that the competing product be a direct substitute for ZTlido. Rather, if the product would compete for the same customers as ZTlido, whether at the physician, payor, or consumer level, it is a competing product.

### 2. Which Pipeline Products compete?

The question remaining is which of the Pipeline Products compete, directly or indirectly, for the same customers as ZTlido. ZTlido is an opaque patch containing 1.8% lidocaine.[169] Lidocaine works by preventing sodium ion channels from conducting nerve impulses, which reduces the pain felt by the user where it is used. Lidocaine can generally be applied either topically or by injection. The FDA has approved three types of prescription lidocaine patches: ZTlido, Lidoderm, and a

---

[169] JX 591 at 36.

generic patch.[170]  Each is approved only for PHN.[171]  ZTlido is also prescribed off-label for other chronic and neuropathic pain indications, such as lower back pain, neck pain, and hypertension.[172]

Defendants argue that the Pipeline Products are not competitive because Sorrento did not identify them as competitive products in its 10-K filed with the SEC.  That argument is not persuasive, as the 10-K only lists ZTlido's competitors for its indicated use (PHN), the only use that Scilex is legally allowed to market.[173]  The court must conduct a more nuanced analysis in order to determine whether these products compete.

### a.    Probudur

Probudur is a bupivacaine injectable.  Like ZTlido, it blocks sodium ion channels to prevent nerve impulses.[174]  It is intended to be indicated for post-operative use.  A doctor would use Probudur by injecting it at a wound site before the wound is closed.  Probudur is not intended to be self-administered and would

---

[170] The FDA has approved generic lidocaine patches from at least five companies.  *Id.* at 38–39 (identifying Actavis Labs UT Inc., Mylan Technologies Inc., Rhodes Pharms, Amneal, and Nal Pharm as producers of generic 5% lidocaine patches).

[171] *Id.* at 37.

[172] JX 466.

[173] Tr. 318:9–20 (Shah).

[174] JX 591 ¶¶ 50–51 (Rana Report).

need to be administered in a hospital or other medical setting.[175]  In other words, it would only be prescribed in situations where the patient is in a surgical setting and has an open wound.[176]  By contrast, ZTlido is a patch that must be applied to intact skin.[177]  Although Probudur and ZTlido are both used to treat localized pain, the differences in the drugs' mode of application makes it near impossible that any physician would use ZTlido and Probudur interchangeably or would prescribe ZTlido in the same context that it would administer Probudur.[178]  Likewise, patients would not even have the option to advocate for or choose Probudur in the place of ZTlido, as Probudur can only be administered by a medical professional.  The two drugs use different active ingredients, employ different applications, and target different patient profiles.  Plaintiffs have not established that ZTlido and Probudur compete directly or indirectly.

---

[175] Tr. 501:5–17 (Mack); JX 591 at 51.

[176] Virpax has stated that it plans to "to market Probudur to general surgeons, anesthesiologists, and orthopedic surgeons within the $577 million (as of 2019) local anesthetic postsurgical market."  JX 555 at 7.

[177] Tr. 752:11–12 (Rana).

[178] *Id*. at 752:13–753:2.  Suresh Khemani, Scilex's chief commercial officer, offered a bizarre anecdote in which a patient had used a ZTlido patch on an abdominal surgery incision site. *Id.* at 407:16–408:8 (Khemani).  ZTlido's warning label informs patients that it may only be used on intact skin. *Id.* at 501:23–502:4 (Mack).  Further, Mack testified that using ZTlido in this manner would rip the stitches out when it was removed. *Id.*  At best, Khemani's anecdote appears highly inadvisable.

### b. Envelta

Envelta is an opioid product being developed for use via nasal inhalation. Envelta is an exogenous, or synthetic, opioid in the enkephalin class.[179] Virpax intends to seek FDA approval for an indication of acute and chronic cancer pain.[180] Envelta involves an NCE, and therefore is not eligible for a streamlined path to approval. Envelta is applied through a nasal spray, sending the chemical entity through the blood-brain barrier to the targeted receptor in the brain. Envelta targets the central nervous system, providing pain relief for the entire body. By contrast, ZTlido treats localized pain. It is a patch administered to a specific part of the body and works by delivering lidocaine to that area, numbing the user's pain. A maximum of three ZTlido patches can be applied to a patient at one time.[181]

Both Envelta and ZTlido position themselves as alternatives to traditional opioids, delivering pain relief without addictive side effects. As a result, both drugs would be in the "toolbox" of a prescribing physician looking to treat pain without

---

[179] JX 591 at 52. Most opioids target the mu receptor. Contacts with the mu receptor may cause certain side effects, including opioid use disorder. "Envelta, however, targets the delta receptor and, therefore, has the potential to reduce pain without causing addiction, withdrawal, tolerance, or respiratory depression." *Id.* at 55–56.

[180] Tr. 746:8–15 (Rana).

[181] *Id.* at 502:8–19 (Mack).

resort to opiates, including physicians addressing the symptoms of a patient with an opioid sensitivity or a history of addiction.[182]

Defendants argue that ZTlido is specifically targeted to treat pain located in a discrete part of the body, and therefore that a drug capable of providing full body relief would not be a suitable alternative. While the products appear to have at least some overlapping market presence,[183] these key differentiators prevent the products from being directly or indirectly competitive. The products have different active ingredients, delivery systems, and mechanisms of pain treatment. Plaintiffs argue that despite these differences, the products can both be used to treat cancer pain and therefore are indirectly competitive. But to argue that any pain product that can be used to treat cancer pain or chronic pain competes with any other drug that can be used to treat those same symptoms stretches the definition of competition under the RCA too far. Under such logic, one might argue that aspirin indirectly competes

---

[182] *See* JX 555 at 9 ("We [Virpax] plan to use the endogenous NCE regulatory pathway to bring this product candidate to market. We plan to target our marketing and selling efforts to pain specialists, anesthesiologists, orthopedics, surgeons, PCPs, Nurse Practitioners ('NPs'), oncologists, and neurologists within the $7 billion (as of 2019) analgesic narcotics market.").

[183] While ZTlido may not be a suitable treatment for widespread pain caused by cancer, Envelta may possibly be a suitable treatment for those struggling with PHN or with lower back pain or neck pain, among other off-label prescriptions of ZTlido. *See* Béatrice Quirion, Francis Bergeron, Véronique Blais, & Louis Gendron, *The Delta-Opioid Receptor; a Target for the Treatment of Pain*, 13 Frontiers Molecular Neuroscience 52 (2020) ("Selective activation of the δ opioid receptor (DOP) has great potential for the treatment of chronic pain . . . with ancillary anxiolytic- and antidepressant-like effects.").

with morphine as they both may be used to treat headaches, ignoring the difference in active ingredients, delivery systems, severity of symptoms, and type of headache to be targeted. This is particularly true in the field of pain products, which is not an industry prone to consolidation of market share. Rather, the pain market is highly diversified, comprised of products with different strengths, targeted symptoms, delivery systems, and active ingredients.[184] Even for indirect competition, there must be a tighter fit between the products alleged to compete in such a broad market. Envelta and ZTlido are simply too differentiated to be competitive here.

### c. Epoladerm

Epoladerm is a topical spray film that uses diclofenac to treat localized pain.[185] Diclofenac is a non-steroidal anti-inflammatory drug ("NSAID") used for the treatment of acute pain or arthritis pain. Virpax will seek FDA approval for Epoladerm using the Flector patch as a comparator.[186] Virpax's 10-K for 2021 directly touted the superiority of Epoladerm over transdermal patches:

---

[184] Tr. 750:13–15 (Rana) ("[S]imply stating that all pain can be treated with one particular agent is just not doing a service to the question that we're looking at."); *id.* at 750:21–751:1 (Rana) ("I don't believe that all non-opioid medicines can be used interchangeably to treat patients' pain conditions, because we have to exercise precision when we select a particular regimen[t] or a medicine for a patient.").

[185] JX 591 ¶ 50.

[186] Plaintiffs appear to argue that Epoladerm is directly competitive with a 3% diclofenac patch previously in Scilex's pipeline. I need not address this theory, as the RCA defines the "Product" for which competition is restricted as "ZTlido (lidocaine patch 1.8%)." JX 185 at 1.

We believe Epoladerm's proprietary spray film technology may lead to adhesion capabilities superior to those of transdermal patches (e.g. Epoladerm does not require any tape reinforcement), while maintaining comparable skin absorption capabilities to transdermal patches currently on the market. Specifically, because the Epoladerm technology does not require a patch to deliver the drug through the skin, we believe Epoladerm may have better adhesion to the skin and may have better accessibility, particularly around joints and other curved body surfaces. Additionally, because Epoladerm is a spray, we believe it will be more aesthetically appealing than transdermal patches.[187]

The 10-K further states that Virpax "plan[s] to target [its] marketing and selling efforts on pain management clinics and high-prescribing healthcare practitioners including orthopedic surgeons, rheumatologists, physical medicine and rehabilitation specialists and primary care within the $7.3 billion (as of 2020) transdermal and topical non-opioid pain market."[188] Although Epoladerm may have a different active ingredient and a different mode of application, Virpax intends to market Epoladerm as an alternative to traditional transdermal patches like ZTlido.[189]

---

[187] JX 555 at 5.

[188] *Id.* Mack testified that he did not believe that Epoladerm competed with ZTlido. Tr. 503:2–14 (Mack). But Mack did not seek the advice of counsel or any others to confirm his belief. In fact, all signs pointed in the opposite direction. For example, financial forecasts prepared by Sahebi at Mack's request specifically evaluate the market for prescription lidocaine patches and depict the market share of ZTlido 1.8%. JX 259 at 6–7. Moreover, Mack made sure to prepare himself to answer questions regarding the competitive advantage that this "patch-in-a-can" product would have over traditional lidocaine patches. JX 225. Mack referred to Epoladerm as a "spray on patch." JX 221.

[189] Defendants' expert's opinion that Epoladerm is molecularly more similar to ibuprofen than it is to ZTlido, JX 591 ¶ 50, does not mean that the two products are not competitive. While the products may have different active ingredients, they both work topically to treat

If Epoladerm makes it to market, it will contend with ZTlido and other transdermal patches, both lidocaine and diclofenac, for customers.

Defendants argue that Epoladerm cannot be competitive with ZTlido, because Virpax intends to seek FDA approval for Epoladerm as an OTC product and Scilex is not in the OTC business.[190] That argument is unpersuasive. Virpax merely announced its intention to seek OTC approval. In any event, that announcement came in June 2022, just a few weeks before trial. Plaintiffs' contract claims concern conduct that occurred in 2017 and 2018, long before that announcement. *See Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 17 (Del. Ch. 2003) ("The standard remedy for breach of contract is based upon the reasonable expectations of the parties *ex ante*. . . . Damages are measured as the time of breach." (cleaned up)). Plaintiffs have established that Epoladerm is competitive with ZTlido.

### 3. Can a product compete if it is not yet on the market?

Defendants argue that the Pipeline Products cannot be competitive because they are not currently, and may never be, on the market. Virpax aims to submit

---

musculoskeletal pain. The fact that Epoladerm is employed through a spray, rather than a patch, is an improvement on the application method used by ZTlido, not a differentiator which prevents competition. *Xerox Corp. v. Media Scis. Intern., Inc.*, 511 F. Supp. 2d 372, 387 (S.D.N.Y. 2007) ("[T]he development of superior products is 'an essential element of lawful competition.'") (quoting *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 286 (2d Cir. 1979)); *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 381 (3d Cir. 2005) ("Competitive markets are characterized by both price and quality competition.").

[190] Pls.' Answering Br. 26.

Epoladerm and Probudur for FDA approval in 2025, followed by seeking FDA approval of Envelta in 2027.[191] "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." *Bank of the West v. Superior Ct.*, 833 P.2d 545, 552 (Cal. 1992). "Such intent is to be inferred, if possible, solely from the written provisions of the contract." *AIU Ins. Co. v. Superior Ct.*, 799 P.2d 1253, 1264 (Cal. 1990). Whether the RCA is broad enough to prohibit competitive activities that do not involve actual sales is a question of contract interpretation.

Plaintiffs rely on *Stryker*, in which a court rejected the argument that a product could not be competitive if it was not yet on the market. 2013 WL 1962391, at *5. "No support exists for such a narrow and arbitrary definition of the competitive market." *Id.* However, the agreement in *Stryker* was quite broad, defining competing products to include "any product, process, technology, machine, invention or service . . . in existence or under development." *Id.* at *3.

*Nostrum Pharmaceuticals, LLC v. Dixit*, 2016 WL 5806781 (S.D.N.Y. Sept. 23, 2016), is closer to the mark. In *Nostrum*, a corporate executive agreed not to "own . . . or in any way assist any person or entity ('Compete') in the conduct of the manufacture, distribution, marketing or sale of pharmaceutical and/or biological products in the United States." *Id.* at *4 (emphasis removed). The executive went

---

[191] Tr. 597:2–11 (Mack).

49

on to sign memorandums of understanding for the production of a competing product. *Id.* The defendant argued that he could not compete with Nostrum because he had not begun actually selling the competitive pharmaceutical. The court disagreed:

> That Dixit did not actually begin selling generic pharmaceuticals during the six-month non-compete period is immaterial; the "conduct of the manufacture, distribution, marketing [and] sale of pharmaceutical and/or biological products," like a generic drug, begins with identifying a manufacturer of the product and seeking regulatory approval to begin selling it. Dixit had taken steps toward accomplishing both of those steps within months of leaving Nostrum by entering into the MOU with Centaur.

*Id.* at *11.

Under the RCA, Mack agreed not to "directly or indirectly" "have any Relationship" in which Mack engages in or assists any entity "directly or indirectly, with respect to any activity that is directly or indirectly competitive with [ZTlido] or any business related to [ZTlido]."[192] This language is broad enough to include presales activities.[193] Activities undertaken in an effort to prepare a product to compete constitute an activity indirectly competitive with ZTlido. *See Tristate Courier & Carriage, Inc. v. Berryman*, 2004 WL 835886, *9 & 14 (Del. Ch. Apr. 15, 2004)

---

[192] JX 185 at § 2.

[193] Indeed, at the time Sorrento and Mack executed the RCA, ZTlido had not been approved by the FDA. Under Defendants' logic, there could be no competition until ZTlido had been approved and was on the market. That is not a reasonable reading of the contract. *See Sequeira v. Lincoln Nat'l Life Ins. Co.*, 192 Cal. Rptr. 3d 127, 132 (Cal. Ct. App. 2015) (noting that courts "avoid interpretations that create absurd or unreasonable results").

(finding former employee "indirectly competed with [his former employer] by assisting in the development of a company offering services substantially similar to those offered by [the former employer]"). *But see MQ Assocs., Inc. v. North Bay Imaging, LLC*, 270 Fed. App'x 761, 764 (11th Cir. 2008) (declining to rely on *Berryman* to find that preparing to open a business constitutes indirect competition where the business never ultimately opened).[194] Mack's conduct, including serving as CEO of a company seeking to develop and obtain approval for a product that is intended to be prescribed for the same uses as ZTlido, falls within the prohibitions of the RCA.[195] Therefore, by signing the option agreement with MedPharm on April 11, 2017, and exercising that option agreement on behalf of Virpax on June 6, 2017 to license Epoladerm, Mack breached the RCA. His continuing to engage in the development of Epoladerm thereafter with Virpax is a further breach of the RCA. Because the RCA tolls the Restrictive Period until any breach is resolved, the

---

[194] Unlike the company in *MQ Associates*, Virpax became an active, operating business.

[195] Defendants argue that the Virpax Pipeline Products could not compete with ZTlido because none of the Pipeline Products is targeted at PHN—which is the only indicated use for ZTlido. Defs.' Answering Br. 23–24. That argument lacks support. *See Scilex Pharms., Inc. v. Sanofi-Aventis U.S. LLC*, 2021 WL 11593043, at *18 (N.D. Cal. Aug. 16, 2021) ("[L]imitations on Scilex's ability to advertise—but not sell—ZTlido for off-label uses is irrelevant to the connection between Defendants' allegedly false advertisements and the profits Scilex loses from consumers who would have bought a ZTlido patch were they not misled.").

51

Restrictive Period extends for 18 months and 27 days from the final adjudication of this action.[196]

## B.    Count II: Tortious Interference with Contract

Plaintiffs allege that Virpax tortiously interfered with the RCA between Mack and Sorrento. Both parties brief the issue under Delaware law and make no argument that any other state's law should apply. Accordingly, the court will apply Delaware law without further inquiry into the conflict of laws. *See Nuvasive, Inc. v. Miles*, 2020 WL 5106554, at *9 (Del. Ch. Aug. 31, 2020) (declining to engage in a choice of law analysis *sua sponte*).

To succeed on its claim, Sorrento must establish the existence of "(1) a contract, (2) about which defendant knew, *and* (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury." *Bhole v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013) (internal quotations omitted). Defendants argue that the claim for tortious interference with contract against Virpax must fail because (a) Virpax is not a stranger to the contract and its conduct is protected by an "affiliate privilege"; (b)

---

[196] JX 185 § 3(d) ("In the event of any breach or violation by Covenantor of any of the Restrictive Covenants, the time period of such covenant with respect to Covenantor shall be tolled until such breach or violation is resolved.").

52

Virpax did not undertake "an intentional act" which contributed to Mack's breach; and (c) because Plaintiffs have not established non-speculative harm.[197]

### 1. Intentional Act

Defendants argue that the claim for tortious interference with contract fails because Defendants did not take an intentional act that was a significant factor in causing breach of the RCA.[198]  In *Berryman*, the court held that an entity intentionally interfered with a covenant not to compete when it solicited the assistance and involvement of an individual that it knew was bound by the restrictive covenant.  2004 WL 835886, at \*12; *see also NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 34 (Del. Ch. 2009) ("[T]he Complaint adequately alleges that Harbinger knew about the No–Shop Clause and Prompt Notice Clause, but nevertheless engaged in contacts and communications that violated those clauses.  As in [*Berryman*], this is sufficient for pleading purposes.").  The same is true here. Virpax knew that Mack was bound by the RCA.  Virpax employed Mack as CEO and utilized his experience and knowledge to license, seek approval for, and

---

[197] Virpax makes a half-hearted argument that Plaintiffs offered no evidence that Mack disclosed the RCA to Virpax.  Defs.' Answering Br. 57.  This argument fails, because as CEO of Virpax, Mack's knowledge is imputed to the company.  *See, e.g.*, *New Enter. Assocs. 14, L.P. v. Rich*, 292 A.3d 112, 140 n.15 (Del. Ch. 2023) (imputing knowledge of contractual party, as agent, to principal in context of tortious interference with contract); *Tchrs.' Ret. Sys. of La. v. Aidinoff*, 900 A.2d 654, 671 n.23 (Del. Ch. 2006) ("[I]t is the general rule that knowledge of an officer or director of a corporation will be imputed to the corporation.").

[198] Defs.' Answering Br. 56.

ultimately prepare to market Epoladerm[199] to compete with ZTlido.[200] Virpax admits that "[o]n June 6, 2017, Virpax entered into the License Agreement with MedPharm" and that "[p]ursuant to this License Agreement, Virpax began development of the product under the trademark Epoladerm™."[201] The entry into those agreements were intentional acts that caused Mack to breach the RCA.

### 2. Lack of Justification

"The tort of interference with contractual relations is intended to protect a promisee's economic interest in the performance of a contract by making actionable 'improper' intentional interference with the promisor's performance." *Shearin v. E.F. Hutton Gp., Inc.*, 652 A.2d 578, 589 (Del. Ch. 1994). The law recognizes, however, that in a competitive business environment, not all interference with contract is actionable in tort. *See Agilent Techs. v. Kirkland*, 2009 WL 119865, at

---

[199] In February 2017, Mack created a document in his Virpax account listing questions about how Epoladerm compared to lidocaine patches. JX 225. Mack wanted to "kind of earmark them to try to answer those questions later on or have them in front of me if I was on a phone call with someone." Tr. 536:19–21 (Mack). A 2018 internal Virpax forecast refers to Epoladerm as "superior alternative" to transdermal patches. JX 360 at 15. It projects Epoladerm sales of $2.9 billion from 2020 to 2029. *Id*. at 30. Mack reviewed the assumptions underlying the forecast when he received the presentation. Tr. 605:3–10 (Mack). In May 2020, Virpax was forecasting approximately $1.6 billion in profit on approximately $3.4 billion in sales of Epoladerm from 2020 through 2039. JX 453; Tr. 612:18–23 (Mack).

[200] Tr. 482:7–15 (Mack) ("Q. What, if any, work did you do for Virpax while you were employed by Scilex? . . . A. I in-licensed the spray film technology for diclofenac. Q. And which Virpax product is that? A. That is now the Epoladerm product.").

[201] PTO ¶ 33.

*8 (Del. Ch. Jan. 20, 2009) (observing that "claims for unfair competition and tortious interference must necessarily be balanced against a party's legitimate right to compete"); *accord New Enter. Assocs. 14*, 292 A.3d at 142. "Determining when intentional interference becomes improper requires a complex normative judgment relating to justification based on the facts of the case and an evaluation of many factors." *New Enter. Assocs. 14*, 292 A.3d at 142 (cleaned up) (quoting *Shearin*, 652 A.2d at 589). When deciding whether interference with contract was justified, the court considers the factors identified in Section 767 of the Restatement (Second) of Torts:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties.

*WaveDivision Hldgs., LLC v. Highland Cap. Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012) (quoting Restatement (Second) of Torts § 767 (1979)). "The determination of whether an actor's conduct is 'privileged' or 'not improper' under § 767 of the Restatement and the Restatement (Second) is particularly factual, depending on a wide variety of factors to be applied to all of the facts and circumstances in a given case." *DeBonaventura v. Nationwide Mut. Ins. Co.*, 428 A.2d 1151, 1154 (Del. 1981); s*ee* Restatement (Second) of Torts § 767 cmt. b ("Since the determination of

55

whether an interference is improper is under the particular circumstances, it is an evaluation of these factors for the precise facts of the case before the court.").

In this case, the nature of Virpax's conduct with respect to Mack's breach of the RCA is clear. Virpax, led by Mack, entered into an agreement with MedPharm to license Epoladerm, an agreement that was negotiated by Mack for the benefit of Virpax while Mack was a fiduciary to Scilex.[202] Mack's assistance to Virpax in negotiating and entering into the option agreement and license agreement violated Mack's RCA. Using the words of that agreement, "[Mack] engage[d] or assist[ed] [Virpax], directly or indirectly, with respect to . . . activity that is directly or indirectly competitive with [ZTlido] or any business related to [ZTlido]."[203] Virpax's motive was to obtain a license to develop, in its own words, a "proprietary spray film technology [that] may lead to adhesion capabilities superior to those of transdermal patches."[204] As noted above, if it reaches the market, Epoladerm will compete with transdermal patches, like ZTlido.[205] Virpax's conduct and motive

---

[202] *See* Restatement (Second) of Torts § 767 cmt. c (1979) ("The issue is not simply whether the actor is justified in causing the harm, but rather whether he is justified in causing it in the manner in which he does cause it.").

[203] JX 185 § 2; *see* Tr. 482:7–15 (Mack).

[204] JX 555 at 5; *see also id.* ("[W]e believe it will be more aesthetically appealing than transdermal patches.").

[205] A May 29, 2018 article promoting the Virpax license, which included an interview with Mack, referred to Epoladerm as "patch-in-a-can." *See* JX 354 ("Malvern-based Virpax Pharmaceuticals says it has licensed MedPharm Ltd. 'to develop non-opioid pain management products delivered' through Virpax's 'Patch-in-a-Can MedSpray' System.").

56

were directly contrary to Sorrento's and Scilex's interest, which was to prevent Mack from assisting potential competitors to Scilex and ZTlido for the two-year period of the RCA, while Scilex continued the process of obtaining FDA approval.[206] While Virpax had a general business interest in competing in the pain management marketplace, it also knew of Sorrento's contractual interest in preventing Mack from assisting Virpax and other ZTlido competitors during the two-year non-compete period. *See* Restatement (Second) of Torts § 767 cmt. f ("If the interest of the other has been already consolidated into the binding legal obligation of a contract . . . that interest will normally outweigh the actor's own interest in taking that established right from him."). Virpax's entry into the MedPharm license agreement directly interfered with Mack's agreement with Sorrento, a company that Mack unabashedly referred to as a "direct competitor" to Virpax.[207] "The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will." Restatement (Second) of Torts § 768(2); *see id.* § 767 cmt. e ("[I]nterference would be improper if it involved persuading the third party to commit a breach of an existing contract with the other."); *Symphony Health*

---

[206] *See* Restatement (Second) of Torts § 767 cmt. d (observing that the proximity of the actor's conduct to the actual interference is a consideration in assessing motive).

[207] JX 387 ("SCILEX and Sorrento are Pain focus[ed]. They are direct competitors. We are not friends.").

*Solutions Corp. v. IMS Health, Inc.*, 2014 WL 4063360, at \*2 (E.D. Pa. Aug. 15, 2004) ("However, the competitor's privilege does not shield a company from tortious interference with an employee bound by a covenant not to compete." (citing Restatement (Second) of Torts § 768)). Where, as here, the tortfeasor induces another to breach a contract, "the other factors need not play as important a role in the determination that the actor's interference was improper." Restatement (Second) of Torts § 767 cmt. h. Applying the Restatement factors to the facts and circumstances of this case, the court finds that Virpax improperly interfered with the RCA and, therefore, the interference was without justification.

Virpax does not attempt to argue that its conduct was justified under the factors identified in Section 767 of the Restatement. Rather, it contends that Virpax possessed an "interference privilege" because its business interests were aligned with Mack.[208] For this, Virpax relies on cases following and applying the so-called "stranger rule." Under the stranger rule: "Imposition of liability for tortious interference with [a] contractual relationship requires that the defendant be a stranger to both the contract and the business relationship giving rise to and underpinning the contract." *Tenneco Auto., Inc. v. El Paso Corp.*, 2007 WL 92621, at \*5 (Del. Ch. Jan. 8, 2007) (internal quotation marks omitted); *see also Mesirov v. Enbridge*

---

[208] Defs.' Answering Br. 54–55.

*Energy Co.*, 2018 WL 4182204, at *12 (Del. Ch. Aug. 29, 2018); *Grunstein*, 2009 WL 4698541, at *16; *Surf's Up Legacy P'rs, LLC v. Virgin Fest, LLC*, 2021 WL 117036, at *7 (Del. Super. Jan. 13, 2021).

The stranger rule arises as a potential defense when a parent corporation is alleged to have tortiously interfered with a contract to which its subsidiary was a party. *See Shearin*, 652 A.2d at 591 ("According to this theory, a parent and its wholly owned subsidiaries constitute a single economic unit. . . . Under this theory 'interference' by a parent in the performance of contractual obligations of its wholly owned subsidiary, no matter how aggressive, is not actionable."). In a careful analysis of the origins of the stranger rule and its path to Delaware, the court in *Bandera* showed that it was derived from case law in jurisdictions that "adopted an absolute (rather than limited) affiliate privilege." *Bandera*, 2019 WL 4927053, at *27. As *Bandera* found, and more recent Delaware trial court decisions have accepted, the stranger rule's bright-line application "runs contrary to the Delaware Supreme Court's adoption of the multi-factor balancing approach under Section 766" of the Restatement. *Id*. at *28; *see also In re CVR Refining, LP Unitholder Litig.*, 2020 WL 506680, at *16–18 (Del. Ch. Jan. 31, 2020) (agreeing with the reasoning of *Bandera*); *Athene Life & Annuity Co. v. Am. Gen. Life Ins. Co.*, 2020 WL 2521557, at *12 (Del. Super. May 18, 2020) (same); *NewWave Telecom & Techs., Inc. v. Jiang*, 2023 WL 2752393, at *4 (Del. Super. Mar. 15, 2023) ("The

Court finds that the stranger rule does not apply. This rule has been rejected by Delaware courts." (citing *Athene* and *Bandera*)).

Consistent with Restatement approach, Delaware "uses the concept of justification to determine whether interference is improper and accounts for related-party status when assessing justification." *Bandera*, 2019 WL 4927053, at *28; *see NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at *28 (Del. Ch. Nov. 17, 2014) ("When a plaintiff contends that a parent entity tortiously interfered with a contract to which its subsidiary was a party, a court applying Delaware law analyzes the seven [Restatement] factors in a manner that takes into account the dynamics of the parent-subsidiary relationship, including the parent's significant economic interest in its subsidiary, the parent's interest in consulting with its subsidiary about the subsidiary's profit-making opportunities, and the legitimate use of subsidiaries for cabining risk."). In applying the Restatement factors above, the court has considered the relationship between Virpax and Mack and determined the facts do not justify Virpax's interference with the RCA between Mack and Sorrento.[209]

---

[209] Virpax is hard pressed to deny that it is a stranger to the RCA—an agreement that was entered six months before Virpax was even formed. Indeed, Defendants have argued that Virpax was a stranger to the RCA and Sorrento's acquisition of a majority interest in Scilex. *See* Pls.' Pre-Trial Br. 52 ("In selling Scilex to Sorrento and entering into the RCA, Mack was not acting within the scope of his authority as an agent of Virpax, but in his personal

### 3. Injury

Defendants argue that Plaintiffs' claim for tortious interference with contract must fail because even if the other elements are satisfied, there is no resulting injury. Resulting injury is a necessary element of a tortious interference with contract claim. *See WaveDivision Hldgs.*, 49 A.3d at 1174. A sufficient injury occurs when a defendant intentionally engages in wrongful actions that "interfere with [the contractual counterparty's] rightful expectations of performance." *NACCO*, 997 A.2d at 35. In *NACCO*, the court noted that, as a result of the defendant's actions, the contractual party did not receive the full benefit of the contractual protections it had negotiated, including a limitation on topping bids, and instead faced "a competing bidder with a significant leg up thanks to its improper activities." *Id.* Similarly, Sorrento bargained for certain restrictive covenants to prevent Scilex's then-CEO, Mack, from taking his know-how to a competing business. Virpax provided a platform for Mack to do just that—to form and run a competing business, depriving Sorrento of the benefit of its bargain. Indeed, the tolling provision of the RCA in the event of breach captures the contracting parties' acknowledgement that harm would persist after the breach. Accordingly, the Plaintiffs have suffered an

---

capacity, to further his own personal, financial interests. Virpax was a stranger to the transaction."). When applied, the stranger rule has "foreclose[d] liability for tortious interference with contract when the breaching party was controlled by the defendant." *Bandera*, 2019 WL 4927053, at *27. Virpax does not argue that it controlled Mack.

61

injury and they have proved their claim for tortious interference with contract against

Virpax.[210]

---

[210] Count III of the complaint asserts a claim against Virpax for tortious interference with prospective business relations. Plaintiffs did not address this claim their pre-trial brief or their opening post-trial brief. Therefore, the claim is waived. *Oxbow Carbon & Mineral Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 502 n.77 (Del. 2019) ("The practice in the Court of Chancery is to find that an issue not raised in post-trial briefing has been waived, even if it was properly raised pre-trial."); *MHS Cap. LLC v. Goggin*, 2018 WL 2149718, at *16 (Del. Ch. May 10, 2018) (treating claims not briefed as abandoned). Plaintiffs' mere mention of this claim in a footnote in their reply brief did not preserve the claim. *LCT Cap., LLC v. NGL Energy P'rs LP*, 249 A.3d 77, 101–02 (Del. 2021), *corrected* (Mar. 4, 2021) (holding that a legal argument raised for the first time in a reply brief was waived); *see also In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293, at *20 (Del. Ch. Mar. 28, 2018) ("Failure to raise a legal issue in the above-the-line text of a brief generally constitutes waiver of that issue."). Similarly, Plaintiffs have also abandoned Count IV, alleging Mack breached his employment agreement, and Count V, alleging Virpax tortiously interfered with that agreement. The only argument in Plaintiffs' opening brief on the breach and associated tortious interference claim as to the employment agreement is a statement that Mack "breach[ed] his confidentiality obligations" and "violated the non-solicitation provision in his employment agreement by soliciting and hiring Ms. Panzarella and Ms. Roberts to work at Virpax." Pls.' Opening Br. 29. These claims are deemed abandoned. *See In re IBP, Inc. v. S'holders Litig.*, 789 A.2d 14, 62 (Del. Ch. 2001) (deeming arguments not presented in an opening post-trial brief to be waived); *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived."). In order to avoid waiver of an argument, a party must address the facts and legal authority that support its claim. *See* Ct. Ch. R. 171; *Franklin Balance Sheet Inv. Fund v. Crowley*, 2006 WL 3095952, at *4 (Del. Ch. Oct. 19, 2006) ("Under the briefing rules, a party is obliged in its motion and opening brief to set forth all of the grounds, authorities and arguments supporting its motion."); *In re Asbestos Litig.*, 2007 WL 2410879, at *4 (Del. Super. Aug. 27, 2007) ("Moving parties must provide adequate factual and legal support for their positions in their moving papers in order to put the opposing parties and the court on notice of the issues to be decided."). Plaintiffs did not address these claims in the argument section of their brief. Accordingly, Counts III, IV, and V are abandoned.

## C. Count VI: Breach of Fiduciary Duty

Plaintiffs allege that Mack breached his fiduciary duty of loyalty by diverting development opportunities to Virpax while still President of Scilex, and by misusing Scilex's resources to advance Virpax.[211]  As the president of Scilex, Mack owed fiduciary duties to the corporation.  *See Gantler v. Stephens*, 965 A.2d 695, 708–09 (Del. 2009) ("[T]he fiduciary duties of officers are the same as those of directors."). "The duty of loyalty is a corporate fiduciary's duty scrupulously to put the interests of the corporation and its shareholders before his or her own."  *TVI Corp. v. Gallagher*, 2013 WL 5809271, at *14 (Del. Ch. Oct. 28, 2013).  "The essence of a duty of loyalty claim is the assertion that a corporate officer or director has misused power over corporate property or processes in order to benefit himself rather than advance corporate purposes." *Steiner v. Meyerson*, 1995 WL 441999, at *2 (Del. Ch. July 19, 1995).  Corporate fiduciaries may not use their position to further their private interests.  *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939).

Defendants argue that Plaintiffs' fiduciary duty claims must be rejected because they are duplicative of their breach of contract claims.  "[W]here a dispute arises from obligations that are expressly addressed by contract, that dispute will be treated as a breach of contract claim.  In that specific context, any fiduciary claims arising out of the same facts that underlie the contract obligations would be

---

[211] Pls.' Opening Br. 37–38.

foreclosed as superfluous." *Nemec v. Shrader*, 991 A.2d 1120, 1129 (Del. 2010); *Blue Chip Cap. Fund II Ltd. P'ship v. Tubergen*, 906 A.2d 827, 833 (Del. Ch. 2006) (noting that where "the dispute relates to rights and obligations expressly provided by contract, the fiduciary duty claims would be 'superfluous.'"). "[A] claim for breach of contract occupies the field and preempts overlapping claims for breach of duty against corporate fiduciaries." *New Enter. Assocs.*, 2023 WL 3195927, at *31 (collecting cases). The fiduciary duty claims will not be superfluous, however, when "they depend on additional facts as well, are broader in scope, and involve different considerations in terms of a potential remedy." *Schuss v. Penfield P'rs, L.P.*, 2008 WL 2433842, at *10 (Del. Ch. June 13, 2008).

The fiduciary duty claim is not superfluous of the breach of contract claim.[212] The breach of contract claim seeks to hold Mack liable for violating the non-competition provision of the RCA. To establish that claim, Plaintiffs must prove that Mack breached the agreement by directly or indirectly assisting a business entity with respect to any activity that is directly or indirectly competitive with ZTlido. By contrast, Scilex's fiduciary duty claim alleges that Mack improperly used Scilex resources for his own benefit and usurped Scilex's corporate opportunities to develop the Pipeline Products. To succeed on that claim, Scilex need not prove that

---

[212] The fiduciary duty claim is asserted solely by Scilex against Mack. Although the RCA is between Sorrento and Mack, Scilex is also asserting a claim for breach of that agreement as an express third-party beneficiary to the contract. Compl. ¶ 95.

any of the Pipeline Products was competitive with ZTlido. The RCA has no bearing on that claim. Thus, the fiduciary duty claim "depend[s] on additional facts as well, [is] broader in scope, and involve[s] different considerations in terms of a potential remedy." *Schuss*, 2008 WL 2433842, at *10. Therefore, it is not superfluous of the contract claim.

The alleged breaches of fiduciary duty here come in two forms: a duty not to usurp corporate opportunities and a duty not to misappropriate corporate assets.[213] I will address each in turn.

### 1. Duty Not to Usurp Corporate Opportunities

The corporate opportunity doctrine is a species of a corporate officer's broad fiduciary duties. *Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 154–55 (Del. 1996). The doctrine dictates that:

> a corporate officer or director may not take a business opportunity for his own if: (1) the corporation is financially able to exploit the

---

[213] The duty of loyalty also includes a duty to refrain from improperly using confidential information to advance the fiduciary's own personal interests, rather than those of the corporation. *Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1061 (Del. Ch. 2004). "A fiduciary is subject to a duty to the beneficiary not to use on his own account information confidentially given him by the beneficiary or acquired by him during the course of or on account of the fiduciary relation or in violation of his duties as fiduciary, in competition with or to the injury of the beneficiary, although such information does not relate to the transaction in which he is then employed, unless the information is a matter of general knowledge." *Brophy v. Cities Serv. Co.*, 70 A.2d 5, 7–8 (Del. Ch. 1949). Such a duty applies when the information is secret and the employee has acquired it in the course of his employment, regardless of whether the information rises to the level of a trade secret. *Triton Constr. Co., Inc. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *11 (Del. Ch. May 18, 2005). Plaintiffs do not argue that Mack breached his duty of loyalty by using confidential information for his own benefit.

opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest or expectancy in the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary will thereby be placed in a position inimicable to his duties to the corporation.

*Id.* As a corollary to that articulation of the doctrine, a corporate officer may take a corporate opportunity if: (1) it is presented to him in his individual capacity; (2) the opportunity is not essential to the corporation; (3) the corporation has no interest or expectancy in the opportunity; and (4) the officer does not wrongfully employ the resources of the corporation in pursuing the opportunity. *Id.* (citing *Guth*, 5 A.2d at 509). These factors are "guidelines to be considered by a reviewing court in balancing the equities of an individual case. No one factor is dispositive and all factors must be taken into account insofar as they are applicable." *Id.* at 155.

Plaintiffs argue that Mack diverted three opportunities that rightfully belonged to Scilex: the opportunity to develop Probudur, Epoladerm, and Envelta. Defendants' argument that Scilex has not proved the elements of a corporate opportunity claim is relegated on one paragraph of the argument section of their post-trial brief.[214] The Defendants contend that Plaintiffs were unable to pursue any of the alleged corporate opportunities diverted to Virpax because all of Scilex and Sorrento's capital, human and fiscal, was tied up in developing ZTlido.

---

[214] Defs.' Answering Br. 51–52.

### a.  Financial viability

The first factor considers the company's financial ability to pursue the opportunity.  There is no bright-line standard for assessing this factor.  *Pers. Touch Hldg. Corp. v. Glaubach*, 2019 WL 937180, at *14 (Del. Ch. Feb. 25, 2019).  The court may exercise flexibility in determining whether an opportunity is financially viable.  *In re Riverstone Nat'l, Inc. S'holder Litig.*, 2016 WL 4045411, at *9 (Del. Ch. July 28, 2016).  Our Supreme Court in *Yiannatsis v. Stephanis by Sterianou*, 653 A.2d 275, 279 (Del. 1995), declined to adopt a bright-line insolvency-in-fact standard.  Since that ruling, courts have gauged a company's financial ability by utilizing the insolvency-in-fact test as well by considering whether a solvent corporation is actually in a position to commit capital.  *Pers. Touch*, 2019 WL 937180, at *14.

Defendants do not dispute that Scilex was a solvent company through all events at issue in this litigation.  After all, in 2016, Scilex had just been purchased by Sorrento, a publicly traded company.[215]  Instead, Defendants argue that Scilex and Sorrento were unable to commit resources to new development projects because all of their cash was tied up in the development of ZTlido.  Ji testified, however, that Sorrento had recently raised sufficient funds to acquire its majority stake in Scilex in late 2016, and that Sorrento would have been able to raise additional funds to

---

[215] *See* Tr. 114:3–5 (Ji).

pursue the right opportunities.[216]  Defendants sought to discredit that testimony by pointing to Sorrento's SEC filings, which acknowledged that Sorrento would "require substantial additional funding which may not be available to [it] on acceptable terms, or at all.  If [it] fail[ed] to raise the necessary additional capital, [it] may be unable to complete the development and commercialization of [its] product candidates or continue [its] development programs."[217]  Defendants also rely on Mack's testimony and emails to prospective licensors that Scilex was not able or willing to commit to new product development.  For example, on January, 24, 2017—while Mack was looking to take Virpax public[218]—he emailed Chezy Barenholz of LipoCure, rejecting the Probudur opportunity on behalf of Scilex, stating:  "We learned that Sorrento will only allocate funding to manage operations that support the development; resubmission and commercialization of ZTlido."[219]  Mack could not cite any evidence to support that statement.  He did not claim to have received that information from Ji or any Scilex board member.  Instead, he testified he was "just really trying to soften the blow a little bit" to Barenholz.[220]

---

[216] *Id.* at 113:13–18; *id.* at 114:3–5.

[217] JX 309 at 23; *see* JX 447 at 26; JX 445 at 24; JX 481 at 27; *see also* Tr. 114: 3–5 (Ji) ("[I]f we find a good opportunity, we always getting [sic] funding.  I raised over $2 billion for the company.").

[218] *See* JX 197; JX 206.

[219] JX 530.

[220] Tr. 459:1–6 (Mack).

Mack had no discussion with Ji or any Scilex board member indicating that Scilex was not financially capable of pursuing the right opportunity if it came along.[221] I find Mack's testimony to be not credible on this issue, particularly given his sustained efforts to create Virpax, a competitor to Scilex, at the same time he was President of Scilex and his extensive efforts to conceal his competitive activities from Scilex and Sorrento.

Certainly, Sorrento was not eager to commit resources to new projects. But the *Broz* test focuses on the company's ability to pursue the opportunity, not the board's likelihood of actually deciding to do so. *In re eBay, Inc. S'holders Litig.*, 2004 WL 253521, at *4 (Del. Ch. Jan. 23, 2004) ("[I]t is no answer to say, as do defendants, that IPOs are risky investments. It is undisputed that eBay was never given an opportunity to turn down the IPO allocations as too risky."). This case is distinguishable from cases like *Broz* and *Balin* in which the company was unable to commit resources to new projects because of their "precarious financial position."[222] Defendants have not established that any structural or situational barrier would

---

[221] Although Mack was not required to formally present the opportunity to the board before taking it for himself, *see Broz*, 673 A.2d at 157, the court is not required to ignore a fiduciary's efforts to conceal his conduct from the board.

[222] *Broz*, 673 A.2d at 155 (finding that the company was not financially able of exploiting an opportunity when it had recently emerged from bankruptcy proceeding and could not commit capital to new acquisitions); *Balin v. Amerimar Realty Co.*, 1996 WL 684377, at *9 (Del. Ch. Nov. 15, 1996) (concluding that the company was not financially capable of making new investments where it "maintains a large structural deficit and is not creditworthy").

preclude Sorrento from raising the funds to undertake the development of these drugs. Instead, when Sorrento acquired control of Scilex, Sorrento tasked Mack specifically with seeking new opportunities for Scilex at a time when it was still seeking FDA approval for ZTlido. It strains credulity to suggest that Scilex and Sorrento lacked resources to pursue other opportunities when Mack was specifically tasked with doing so. Mack's self-serving testimony to the contrary is not credible, particularly given: (1) Mack's efforts to conceal his diversion of these opportunities from Scilex and Sorrento; (2) the absence of any testimony from a Scilex or Sorrento director that these opportunities were off the table; (3) testimony from Scilex directors that it had not precluded early-stage products; and (4) Sorrento's status as a public company in a position to raise funds to support promising opportunities. Plaintiffs have established that Sorrento and Scilex were financially able to undertake development opportunities with LipoCure, MedPharm, and Nanomerics.

### b. Line of business

"[A] company's line of business includes all activities where the company has 'fundamental knowledge, practical experience and ability to pursue' provided that the activity is 'consonant with its reasonable needs and aspirations for expansion.'" *SDF Funding LLC v. Fry*, 2022 WL 1511594, at *16 (Del. Ch. May 13, 2022) (quoting *Guth*, 5 A.2d at 514). This factor is to be applied "reasonably and sensibly

70

to the facts and circumstances of the particular case" and should be given flexibility when the case requires. *Guth*, 5 A.2d at 514.

Scilex is in the business of developing and commercializing pharmaceutical pain management products.[223] Defendants do not argue that the opportunities for Epoladerm, Probudur, and Envelta are not within Scilex's line of business.[224]

### c. Interest or expectancy

The interest or expectancy factor implicates many of the same considerations as the former factor and largely concerns whether there is a tie between the opportunity and the nature of the corporation's business. *Deane v. Maginn*, 2022 WL 16557974, at *17 (Del. Ch. Nov. 1, 2022). When a company rejects an opportunity, it no longer has an interest or expectancy in that opportunity. In such a situation, the officer may be free to take the opportunity for himself.

In this case, there was a strong tie between Scilex's business and the opportunities with MedPharm, LipoCure, and Nanomerics. After all, Mack's job description as President of Scilex included searching out new development opportunities for pain drugs.[225]

---

[223] JX 492 at 5; *see also* Tr. 329:19–22 (Shah) ("[W]e were building a company that was focused on non-opioid therapies, and clearly we were building on a portfolio of -- for both development-stage programs and commercial programs.").

[224] Defs.' Answering Br. 52.

[225] Tr. 29:20–30:24 (Ji).

Turning first to LipoCure. Vought introduced Scilex to LipoCure in late 2015. Scilex and LipoCure signed a non-disclosure agreement to explore the possibility of developing Probudur, and by August 2016, they went as far as to exchange proposed term sheets. In July 2016, these term sheets were forwarded to Ji, the CEO of Sorrento, whose sign-off was necessary before a transaction could go forward.[226] On January 25, 2017, Mack informed Barenholz that Sorrento would not allocate resources to develop a new product like Probudur. He indicated that Scilex "will continue to update our business case for LC 400 so we are in the best position to support the development of LC 400 once ZTlido is approved or we receive additional funding."[227] But Mack did not wait for funding to free up.[228] Instead, he reached out to LipoCure in March 2017 and shifted the opportunity to his own company, Virpax.

---

[226] JX 136; JX 140.

[227] JX 530. *See also* Tr. 106:14–17 (Ji) (testifying that Scilex did not abandon LipoCure). Defendants cite to a July 2017 email from Vought as evidence that Scilex "abandoned" LC400 in favor of internal development, but this understanding is conflicted by the January 25 Mack email as well as by the continued discussions of LipoCure in April 2018. JX 338. Vought testified, however, that Scilex never abandoned the opportunity and that it reengaged with LipoCure after resubmitting the ZTlido NDA. Tr. 220:6–14 (Vought).

[228] Defendants make much of the fact that Sorrento declined to jump into an opportunity to develop LC400 in late 2016. JX 131; JX 190; JX 218; JX 220. But Scilex explicitly left the door open with LipoCure to return to the project after ZTlido reached a later stage. JX 530 at 2 ("We will continue to update our business case for LC 400 so we are in the best position to support the development LC 400 once ZTlido is approved or we receive additional funding."); Tr. 217:21–219:5 (Vought) (noting that Scilex was considering the LC400 technology "to contribute [to] and complement" its other products).

It was not Mack's prerogative unilaterally to decide that an opportunity was free for the taking under the circumstances of this case. As evidenced by Mack's January 25, 2017 email to Barenholz, Scilex was still considering whether to develop LC400 and LipoCure was willing to wait.[229] Scilex remained interested in LC400 in April 2018.[230]

As to Nanomerics, the circumstances under which the opportunity was presented to Mack are different. Mack initially formed a relationship with Nanomerics to investigate a potential dry eye product. Mack, Pedranti, Burrows, and Ng deliberately excluded Ji from that relationship.[231] It was through this relationship that Envelta was presented to Mack. But once presented with the opportunity, Mack did not present it to Scilex, with whom he was still employed.[232] Instead, he executed a CDA between Virpax and Nanomerics. The post-hoc explanation that Mack offers to substantiate his failure to disclose Envelta to Scilex do not excuse the fact that Scilex was entitled to opportunities to develop pain products that Mack discovered while he served as President of Scilex, as his job was to find such opportunities. *See Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1061

---

[229] JX 530.

[230] JX 338.

[231] JX 135.

[232] JX 301 (diverting opportunity to Virpax). This email was sent on March 5, 2018. Mack sent in his resignation to Scilex on March 12, 2018.

n.82 (Del. Ch. 2004) ("While the opportunity may not be the right one after thorough consideration, it was [the company's] to explore.").

The sequence of events with MedPharm is even more clear. Muddle contacted Mack, Pedranti, and Vought in 2016 to express interest in a potential collaboration between Scilex and MedPharm.[233] Upon learning about MedPharm's product, Mack diverted the opportunity, first to Troy and later to Virpax.[234] This opportunity was presented to Mack as the individual responsible for finding new development opportunities *for Scilex*.[235] By diverting the opportunity instead to his other businesses, Mack deprived Plaintiffs of an opportunity in which they had an expectancy.

### d. Inimical position

The usurpation of an opportunity places the fiduciary in an inimical position to the company if it "results in a conflict between the fiduciary's duties to the corporation and the self-interest of the director as actualized by the exploitation of the opportunity." *Broz*, 673 A.2d at 157. Each of these opportunities, once taken by Mack, created a conflict between Mack and Scilex. He deliberately hid each of these opportunities from Scilex and Sorrento, choosing instead to pursue them in

---

[233] JX 133.

[234] PTO ¶¶ 22–23.

[235] JX 133; *see also* JX 158 (inquiring as to whether an agreement should be with Troy, IACTA, or Scilex).

secret. *See Deane v. Maginn*, 2022 WL 16557974, at \*19 (Del. Ch. Nov. 1, 2022) ("That Maginn placed himself in a position inimical to his corporate duties to New Media II-B is underscored by his furtive behavior."). Mack used corporate assets to do so, taking trips to Israel to meet with Nanomerics on the company dime,[236] using Scilex staff to facilitate the usurpation,[237] and asking Scilex advisers to use Scilex data to evaluate the opportunities.[238] *See Broz*, 673 A.2d at 156 (noting that misappropriation of the company's proprietary information is one of the fundamental concerns underpinning the corporate opportunity doctrine). Even if these new products do not ultimately make it to market and take market share away from ZTlido, Mack made himself an adversary of Scilex by taking up these opportunities instead of offering them to Scilex.

\* \* \*

Plaintiffs have established that all four factors of the *Broz* framework are in their favor. Considering these factors holistically, I find that Mack breached his fiduciary duty of loyalty by usurping from Scilex the opportunity to develop Probudur, Envelta, and Epoladerm.

---

[236] JX 148; Tr. 348:8–349:15 (Shah); *id.* at 571:6–12 (Mack).

[237] JX 158; JX 238; JX 240.

[238] JX 238; JX 262.

## 2. Duty Not to Misappropriate Corporate Assets.

"Most basically, the duty of loyalty proscribes a fiduciary from any means of misappropriation of assets entrusted to his management and supervision." *U.S. West, Inc. v. Time Warner, Inc.*, 1996 WL 307445, at *21 (Del. Ch. June 6, 1996). Mack violated that duty when he used Scilex employees, funds, and data to advance his development opportunities at Virpax.

Plaintiffs demonstrated at trial that Mack received compensation from Scilex for travel in which he solicited opportunities for his other businesses, rather than Scilex.[239] In addition, Mack asked Scilex employees to perform work for Virpax, treating them as resources for himself personally rather than company resources. This included both the use of administrative employees, like Shana Panzarella and Sheila Roberts,[240] as well as Scilex consultants, like Shawn Sahebi, Judee Strouss, Dr. Patel, and Dr. Gudin.[241] In utilizing these employees, Mack asked some, particularly Sahebi, to use Scilex owned or licensed data to conduct forecasting for Virpax.[242]

---

[239] JX 173; JX 148; Tr. 348:8–349:15 (Shah); *id.* at 571:6–12 (Mack).

[240] *See e.g.*, JX 239; JX 199; JX 262; JX 206; Tr. 483:8–484:23 (Mack).

[241] *See e.g.*, JX 238; JX 206 (listing Sahebi, Patel, Gudin as advisers or employees of Virpax); JX 262; Tr. 627:2–20 (Mack) (assigning Patel and Gudin to undertake work for Virpax).

[242] JX 238.

Defendants argue that any diversion by Mack was de minimis, and finding such action to constitute a breach of loyalty would mean that no employee could perform work other than that within his job description during working hours or during a work trip. I disagree. Mack held a superior position over these employees while he was President of Scilex. He took advantage of that position and the knowledge and capabilities of Scilex's employees to benefit Virpax without independently compensating them. Likewise, he took advantage of Scilex's payment for the trip to meet with Nanomerics while explicitly excluding Scilex from that meeting. Such conduct is inapposite to the standard of conduct for a corporate fiduciary and constitutes a breach of loyalty.

## D. Count VII: Aiding and Abetting

Plaintiffs allege that Virpax aided and abetted Mack's breaches of his fiduciary duties. To establish that Virpax aided and abetted Mack's breach of fiduciary duty, Plaintiffs must show: "(i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in that breach by the defendant[], and (iv) damages proximately caused by the breach." *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 861 (Del. 2015). "Knowing participation in a fiduciary breach requires that the nonfiduciary act with the knowledge that the conduct advocated or assisted constitutes such a breach." *Triton Const. Co., Inc. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *16 (Del. Ch. May 18, 2009), *aff'd*, 988

A.2d 938 (Del. 2010). "Where a defendant secondary actor is an entity, the knowledge of an individual fiduciary or agent may be imputed to that entity." *BrandRep, LLC v. Ruskey*, 2019 WL 117768, at *5 (Del. Ch. Jan. 7, 2019); *see also Stewart v. Wilm. Tr. SP Servs., Inc.*, 112 A.3d 271, 303 (Del. Ch. 2015) ("[T]he practice of imputing officers' and directors' knowledge to the corporation means that, as a general rule, when those actors engage in wrongdoing, the corporation itself is a wrongdoer.").

As established, Mack breached his fiduciary duty of loyalty. It is beyond dispute that Mack, as an officer of Scilex, owed fiduciary duties to Scilex. Mack used Virpax to effectuate these breaches, diverting each development opportunity to Virpax rather than offering it to Scilex. In addition, Virpax claimed Scilex employees and advisers as its own, broadcasting its diversion of Scilex's resources to the public.[243] Accordingly, it is proper to attribute Mack's knowledge to Virpax, who knowingly participated in these breaches of loyalty. The same conduct underlying Virpax's tortious interference with the RCA also demonstrates Virpax's knowing participation in Mack's breach of fiduciary duty. As a result of Mack's selfish actions, Scilex lost not only valuable opportunities, but also was forced to

---

[243] *See* JX 206 at 4 (listing Jeffrey Gudin as Chief Medical Officer of Virpax and Shawn Sahebi as an independent board adviser).

pay for expenditures not wholly made for its benefit. Under these facts, Virpax aided and abetted Mack's breaches of fiduciary duty.

### E. Count VIII–IX: Trade Secrets

Plaintiffs bring claims for trade secret misappropriation under both Delaware and California law. Plaintiffs provided the court with a spreadsheet of over one thousand documents, claiming each to be a trade secret and all to be a trade secret cumulatively. Although Plaintiffs ultimately narrowed this list at trial, they failed to prove that most of them, individually or collectively, constitute a trade secret. Plaintiffs, however, did succeed in establishing that five Scilex documents were trade secrets and were misappropriated.

#### 1. Conflict of Laws

Neither side devotes significant effort to address which law should apply to the trade secrets claim. Plaintiffs argue in their pre-trial brief that the court should apply the most significant relationship test and find that California law applies.[244] Defendants agree that the most significant relationship test applies, but argue that when that test is applied, Delaware law prevails.[245]

---

[244] Pls.' Pre-Trial Br. at 50 (citing *Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*, 2010 WL 338219, at *8 (Del. Ch. Jan. 29, 2010)). Plaintiffs do not address the issue in post-trial briefing.

[245] Defs.' Answering Br. at 33 n.13.

A Delaware court will apply Delaware conflict of law rules to determine what law governs a claim. *Folk v. York-Shipley, Inc.*, 239 A.2d 236, 240 (Del. 1968). When faced with a question regarding which law should apply, Delaware courts apply a two-step test. First, the court determines whether there is an actual conflict of law between the proposed jurisdictions. *Bell Helicopter Textron, Inc. v. Arteaga*, 113 A.3d 1045, 1050 (Del. 2015). If there is no conflict, Delaware law will apply. If there is a conflict, then the court will determine which jurisdiction has the most significant relationship to the occurrence and to the parties based on the factors in the Restatement (Second) of Conflict of Laws § 145 (1971). *Bell Helicopter*, 113 A.3d at 1050.

Both sides agree that there is no conflict between Delaware and California law on the subject of trade secrets, because both states have adopted the Uniform Trade Secrets Act.[246] Ordinarily, a false conflict such as this would result in the law of the forum state being applied. The Delaware Uniform Trade Secrets Act, however, does not apply extraterritorially. *Focus Fin. P'rs, LLC v. Holsopple*, 250 A.3d 939, 970 (Del. Ch. 2020). Absent clear legislative intent, an individual cannot be punished under Delaware law for an action occurring exclusively in California. *Id.* (quoting *J.E. Rhoads & Sons, Inc. v. Ammeraal, Inc.*, 1988 WL 116423, at *2 (Del. Super.

---

[246] *Id.*; Pls.' Opening Br. 41 n.11.

Oct. 21, 1988)). No action in support of misappropriation took place in Delaware. Rather, the documents alleged to be trade secrets were taken from Scilex's California headquarters in violation of confidentiality obligations governed by California law. That the companies involved were incorporated in Delaware does not alter this result. *See Holsopple*, 250 A.3d at 970 (noting that the state of incorporation is not a significant fact when determining what law governs a claim for misappropriation for trade secrets). Accordingly, Plaintiffs' claim for misappropriation of trade secrets is appropriately governed by the law of California.

## 2. Qualification for Trade Secret Protection

A trade secret is "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) [d]erives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d). Trade secrets must be identified with sufficient particularity as to separate the allegedly misappropriated information from matters of general knowledge and to allow the defense to ascertain, at minimum, the boundaries within the trade secret lies. *Altavion, Inc. v. Konica Minolta Sys. Lab'y, Inc.*, 171 Cal. Rptr. 3d 714, 729 (Cal. Ct. App. 2014). Even if some of the elements of a trade secret are not protected trade secrets, the combination of those elements

81

may be a protected trade secret if it has independent economic value. *Id.* at 731 (finding an implementation system to be "potentially protectable as a 'combination of characteristics and components' . . . regardless of whether particular design concepts separately qualified for protection as trade secrets.").

It is the Plaintiffs' burden to establish that the allegedly misappropriated information constitutes a trade secret. *Sargent Fletcher, Inc. v. Able Corp.*, 3 Cal. Rptr. 3d 279, 284–85 (Cal. Ct. App. 2003). Once a party proves that certain information is a trade secret, it must also prove that the trade secret was misappropriated "to attain an unfair competitive advantage." *Morlife, Inc. v. Perry*, 66 Cal. Rptr. 731 (Cal. Ct. App. 1997). In other words, Plaintiffs must prove that the Defendants improperly used the Plaintiffs' trade secrets. *Sargent Fletcher*, 3 Cal. Rptr. 3d at 285 (citing Cal. Civ. Code § 3426.1).

Plaintiffs argue that the documents should be considered together as one large trade secret, as they are the cumulative result of all of Scilex's research and development efforts. Based on this same theory, Plaintiffs request approximately $7 million in damages, constituting the total amount expended by Scilex for research and development between 2012 and 2017.

Trade secrets are defined under California law to include a compilation of information, so long as that compilation "(1) [d]erives independent economic value, actual or potential, from not being generally known to the public or to other persons

who can obtain economic value from its disclosure or use; and (2) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d). "A compilation trade secret cannot be just an amorphous collection of disconnected information. Instead, the compilation of underlying data sources must be integrated to embody a definite methodology, process, technique, or strategy." L.M. Brownlee, *Intellectual Property Due Diligence in Corporate Transactions* § 11.16 (Westlaw 2023); *see also* Tait Graves & Alexander Macgillivray, *Combination Trade Secrets and the Logic of Intellectual Property*, 20 Santa Clara High Tech. L.J. 261, 277 & n.34 (2004) ("Without expressly discussing an interrelationship requirement, many cases have defined combination secrets using language that implicitly suggests that claiming some interrelationship between individual components is required."). The issues with the identification of trade secrets in general are magnified in the context of compilation trade secrets. *See* Charles Tait Graves & Sonia K. Katyal, *From Trade Secrecy to Seclusion*, 109 Geo. L.J. 1337, 1409–10 (2021) ("[C]atchall descriptions, a list of categories of alleged trade secrets in broad terms, or a listing of concepts that the plaintiff asserts constitute its trade secret information tend to be insufficient." (internal quotations omitted) (cleaned up)). It is the plaintiff's burden to identify the purported trade secrets with reasonable particularity. *Altavion*, 171 Cal. Rptr. 3d at 43 ("It is critical to any [UTSA] cause of action—and any defense—that the information claimed to

83

have been misappropriated be clearly identified. Accordingly, a California trade secrets plaintiff must, prior to commencing discovery, identify the trade secret with reasonable particularity." (internal quotations omitted)). Where a plaintiff does so by pointing to certain categories of information, it must prove that category identifies only trade secrets. *See Whyte v. Schlage Lock Co.*, 125 Cal. Rptr. 2d 277, 286 (Cal. Ct. App. 2002) (finding that a category "is too broad to enforce because it does not differentiate between truly secret information (such as formulas and product design) and new product information which has been publicly disclosed").

In support of its theory that all of the more than 1,000 documents identified are trade secrets, Plaintiffs rely on *Uhlig LLC v. Shirley*, 2012 WL 2923242, at *5– 6 (D.S.C. July 17, 2012). The defendants in *Uhlig* brought a renewed motion for judgment as a matter of law, or alternatively, moved for a new trial, after a jury returned a verdict in favor of the plaintiff. *Id.* at *2. "The court may grant a motion made under Rule 50(b) only 'if there is no legally sufficient evidentiary basis for a reasonable jury to find for the [non-moving] party.'" *Id.* (quoting *Cline v. Wal–Mart Stores*, 144 F.3d 294, 301 (4th Cir. 1998)). The defendants argued that Uhlig had failed to adequately identify the trade secrets at issue and had not submitted any evidence to demonstrate the existence of the alleged trade secrets.

The court in *Uhlig* explained that a trade secret may be a "unique combination or compilation of information otherwise publicly available," but such a compilation

84

"must be sufficiently identified to provide reasonable details concerning the information which makes up the secret and how that information relates together to form the secret." *Id.* at *5. It is the plaintiff's responsibility to identify the trade secret sufficiently so that the court and in the *Uhlig* case, the jury, may engage in a meaningful analysis of trade secret claim. *Id.* "[T]he identification must amount to more than simply a reference to lists of categories or documents containing general areas of information and unidentified trade secrets." *Id.*

The court held that Uhlig had adequately identified compilation trade secrets in certain information relating to specific customer accounts, which included six more specific categories of information. *Id.* at *6. Therefore, Uhlig was not required to submit every document identified as part of the compilation for the jury's consideration. The court concluded:

> At trial, Uhlig introduced some of the documents that comprised its trade secrets and submitted summary exhibits detailing the contents of the trade secrets. Uhlig presented testimony from its principal, Mark Uhlig, explaining the nature of the documents listed in the summary exhibits and explaining how the documents functioned together to form the trade secrets. The court finds that this was sufficient evidence from which the jury could have ascertained at least one trade secret which was misappropriated by Defendants.

*Id.* The court in *Uhlig* ruled that under the facts of that case, it was possible for a jury to conclude that a compilation of documents, presented in summary form, functioned collectively to form trade secrets. But the ultimate decision is for the finder of fact, making its own credibility assessments and undertaking its own

85

review of the evidence presented.[247] To make that function possible, the plaintiff must present specific, credible evidence that supports its claim that a compilation trade secret exists here.[248] The issue here is not that Plaintiffs failed to submit every document for the court's review, but rather that they did not present credible evidence as to the categorization of these swathes of documents as trade secrets and failed to prove that the categories identified constituted trade secrets, either individually or in combination with one another.

Plaintiffs' trade secret claim depends primarily on a USB device on which Mack kept documents that he had downloaded or retained during his time at Scilex. At trial, Plaintiffs presented a spreadsheet of over one thousand alleged trade secrets.[249] Plaintiffs placed the numerous alleged trade secrets into eleven

---

[247] Operating on a system of bench trials, the court is the ultimate fact-finder and must ultimately determine the facts as they exist after all evidence is presented by the parties. *See In re Happy Child World, Inc.*, 2020 WL 5793156, at *1 (Del. Ch. Sept. 29, 2020) ("Perhaps the broadest and most accepted idea [in our adversarial system of justice] is that the person who seeks court action should justify the request, which means that the plaintiffs bear the burdens on the elements in their claims. Deeply enmeshed in the fabric of our jury trial courts, this bedrock principle of our adversarial legal system is, it seems, sometimes overlooked by parties litigating in this court of equity where matters are tried to the Bench. . . . The parties beseech the court to view the facts as they see them—as they lived them— whether supported by evidence or not. But that is not how trials work. Factual proof, not fervent pleas for justice, is what drives trial outcomes.") (internal quotations omitted).

[248] *See also Altavion*, 171 Cal. Rptr. 3d at 727 ("It is critical to any [UTSA] cause of action—and any defense—that the information claimed to have been misappropriated be clearly identified. Accordingly, a California trade secrets plaintiff must, prior to commencing discovery, 'identify the trade secret with reasonable particularity.'" (quoting Cal. Code Civ. Proc. § 2019.210)).

[249] JX 786.

categories.[250] For each category, Plaintiffs presented at least one exemplar document. Plaintiffs displayed some of these documents at trial. Plaintiffs relied almost exclusively on Ji to vouch for these documents as trade secrets. Ji testified that he had personally reviewed each document on the spreadsheet, including the night before his trial appearance.[251] Based on his review, Ji testified that each of the documents on the spreadsheet was appropriately identified as a trade secret.[252] Ji lacked credibility on this issue. He could not explain why many of the documents had independent economic value and why the information was not stale.[253] Eventually, he was forced to admit that some documents—such as a letter to

---

[250] The categories were as follows: analysis and assessments of pain market, market forecasts, comparative products, competitors, future indications, and clinical overviews; patient strategy and know-how; ZTlido regulatory strategy and know-how; studies on ZTlido including methodology and results; details and information on the physical structure of ZTlido including diagrams and measurements; instructions, specifications, processes, and know-how related to the manufacturing of ZTlido; data regarding various lidocaine delivery methods; confidential information regarding products Scilex was in the process of developing; strategy and know-how developed by Scilex to navigate and achieve regulatory approval for new products; Scilex agreements; and Scilex investor and business development lists. JX 571A.

[251] Tr. 93:5–11 (Ji).

[252] *Id.* at 93:17–94:4.

[253] *See e.g.*, *id.* at 170:8–171:4; *id.* at 172:2–175:9; *id.* at 165:2–167:3; *id.* at 167:6–169:7 (conflating proprietary information with trade secrets).

investors and the Scilex bylaws—should not be classified as trade secrets despite his earlier testimony.[254]

Plaintiffs have not proved that the information retained by Mack constitutes a compilation trade secret worth the value of their entire R&D expenditure. Many of the exemplar documents that Plaintiffs presented contained stale information[255] or were not reasonably protected.[256] In many instances, Plaintiffs did not introduce evidence to support a finding that the exemplar had independent value or that it was misappropriated. Rather, as to many of these exemplar documents, Plaintiffs did not discuss the document or solicit testimony on the document at trial.

On the other hand, Plaintiffs did establish the elements of trade secret misappropriation as to five documents. JX 22 is a research and development guidance document for a 505(b)(2) submission. The document provides a

---

[254] *Id.* at 177:15–181:3 (testifying that a chart containing information which allegedly constitutes a trade secret is available on the Scilex website); *id.* at 186:18–188:6 (admitting that the Scilex bylaws do not fall within the definition of a trade secret when asked by the court).

[255] Some documents are stale because they reflected a legal strategy that had already come to fruition. JX 71 (showing 2015 patent strategy for certain patents which were approved in 2016). Other documents are not valuable because they contained information that reflected an outdated strategy. JX 85 (forecasting sales for ZTlido and D2T based on a previous marketing strategy, despite Scilex's switch to focusing on pairing their product with gabapentin). Others still are stale because they reflect forecasts that were made six or more years ago and are therefore outdated and inaccurate. *See* JX 762; JX 763; JX 773.

[256] *See, e.g.*, JX 754 (containing an investor letter distributed to Scilex's investors with no promise of confidentiality). Ji admitted that some of the documents that he contended constitute trade secrets are publicly available, but contended that "as a collection, it is not public." Tr. 86:3–7 (Ji).

framework for a company to take a product from its initial stages of development to submission to the FDA under the 505(b)(2) pathway. The document is marked confidential. Plaintiffs' expert, Kevin Faulkner, testified that he found five copies of JX 22 across two of Mack's devices and that Mack had copied the document to the Virpax OneDrive account in late 2019.[257]

Likewise, JX 29 describes the regulatory pathway for a lidocaine patch. The document is marked as confidential to counsel. It contains a list of obstacles that Scilex has encountered or perceived in its pursuit for regulatory approval and also describes the results of a physician survey. Faulkner found that Mack had uploaded JX 29 to the Virpax OneDrive at the end of 2019 and that Mack accessed the file on April 15, 2021, deleting it later that same day.[258]

JX 66 is a section of ZTlido's IND application summarizing the biopharmaceutical studies undertaken on ZTlido. While some of the content would later be published upon FDA approval of ZTlido,[259] JX 66 contained detailed information about these studies that was proprietary and adequately protected. Faulkner testified that this document was copied into Virpax folders on Mack's Maxtor OneTouch USB device.[260]

---

[257] *Id.* at 698:5–699:2 (Faulkner).

[258] *Id.* at 695:1–13.

[259] *Id.* at 208:1–10 (Vought).

[260] *Id.* at 697:17–24 (Faulkner).

JX 122 contains the raw data and charts summarizing data regarding the segmentation of the lidocaine market. The data was derived using specific queries in the IMS Health database. Faulkner testified that Mack accessed this document twice in January 2021.[261]

JX 203 is a target product profile for a diclofenac patch product. The document lays out the intended labeling for the product, outlines the specific studies to be undertaken, and describes the attributes of the product.[262] Plaintiffs demonstrated that Mack accessed and edited JX 203 in order to create the Virpax target product profile for Epoladerm.[263]

As to these five documents, Plaintiffs have established that Mack misappropriated Scilex's trade secrets.

## F. Acquiescence

Defendants argue that Plaintiffs acquiesced to Mack's conduct because Scilex and Sorrento knew of the Pipeline Products and of Virpax, yet remained silent. "Acquiescence applies when the party who possesses a valid challenge to a particular act, having 'full knowledge of his rights and the material facts,' engages in conduct that leads the other party to believe reasonably that the act had been approved. *XRI*

---

[261] *Id.* at 693:15–694:22.

[262] *Id.* at 200:18–206:20 (Vought).

[263] *See* JX 700 (comparing JX 203 with JX 269); Tr. 621:21–625:10 (Mack).

*Inv. Hldgs. LLC v. Holifield*, 283 A.3d 581, 623 (Del. Ch. 2022) (quoting *Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1047 (Del. 2014)). To prevail on a defense of acquiescence, the Defendants must prove that the Plaintiffs, with full knowledge of their rights and the material facts, engaged in conduct that caused the Defendants to reasonably believe that the act had been approved. *XRI*, 283 A.3d at 623. "The defense of acquiescence turns on the objective manifestations of the plaintiff's conduct." *Id.* Plaintiffs must either "(1) remain inactive for a considerable time, (2) freely engage in acts amounting to recognition of the complained-of act, or (3) act in a manner inconsistent with a subsequent repudiation of the complained-of act." *State v. Sweetwater Point LLC*, 2022 WL 2349659, at *5 (Del. Ch. June 30, 2022). Defendants must prove acquiescence by a preponderance of the evidence. *In re Coinmint, LLC*, 261 A.3d 867, 894–95 (Del. Ch. 2001).

Defendants have not met their burden to prove Plaintiffs acquiesced to their conduct. Although Plaintiffs had some information regarding Mack's competitive activities, they lacked full knowledge of the material facts. Mack actively concealed his ventures with Virpax from key Scilex and Sorrento personnel.[264] Defendants

---

[264] JX 253 (explaining away an email sent from Mack's Virpax as just "[a]n old email I need to shut down" despite a direct question from Vought asking "What's Virpax?"); JX 165 (instructing Vought to ignore an email from MedPharm); JX 151 at 1 ("Let's not introduce [MedPharm] to Sorrento"); JX 387 (instructing Gudin not to discuss Virpax when Vought is around); JX 257 (requesting for MedPharm to redact a meeting request because the meeting information would go to Scilex); JX 135 at 1 ("We don't want Henry at Nanomerics."); *see* Tr. 295:2–4 (Pedranti); *id.* at 264:10–18 (Ng); *id.* at 280:10–15.

presented evidence at trial that Scilex knew that Mack was the CEO of Virpax as early as March 22, 2018.[265] Scilex also knew that Mack had licensed DSF100, a "patch-in-a-can" technology.[266] But Scilex did not then know the full content or scope of Mack's competitive activities. Nor did they know that all of these development opportunities were diverted under the nose of Virpax.[267] Defendants do not argue that Scilex made specific manifestations of its assent to Mack regarding his course of conduct. Rather, Defendants argue that Scilex's lack of immediate legal action and following silence should preclude them from relief in this case.

The March 2018 article disclosing Virpax and discussing the MedPharm license did not give Plaintiffs full knowledge of their rights and the material facts. Defendants had no basis upon which to believe that Plaintiffs had excused their conduct. On February 16, 2021, Virpax filed an S-1 in connection with its initial public offering, disclosing Epoladerm, Probudur, and Envelta as products in its development pipeline. Less than a month later, on March 12, 2021, Plaintiffs filed their complaint in this action.

In reality, Defendants' acquiescence defense is a thinly veiled laches defense for which Defendants cannot show Plaintiffs filed their complaint outside the

---

[265] JX 320; JX 321.

[266] JX 354; Tr. 124:14–126:5 (Ji); JX 357.

[267] Tr. 17:7–21 (Ji).

analogous statute of limitations period.[268]  Defendants have not shown that Plaintiffs had full knowledge of their rights and material facts or that Plaintiffs engaged in conduct that would reasonably lead Defendants to believe that Plaintiffs had approved Defendants' conduct.  Accordingly, Defendants have failed to establish a defense of acquiescence.

## G. Remedy

Having found that Mack breached the RCA, breached his fiduciary duties, and misappropriated Scilex's trade secrets, and that Virpax tortiously interfered with the RCA, aided and abetted Mack's fiduciary breaches, and misappropriated Scilex's trade secrets, the court must craft an appropriate remedy.  The question remaining is what is the scope of that relief?  The Plaintiffs seek a combination of equitable and monetary relief, including an injunction, extension of the RCA, damages, constructive trust and/or a reasonable royalty on the revenues that may eventually be generated by the Pipeline Products.[269]

It is this court's responsibility to "put in place a balanced remedy that is equitable and reasonably tailored to address the precise nature of the misconduct at

---

[268] *See* Cal. Com. Code § 2725 (delineating a four-year statute of limitations for claims for breach of contract); Cal. Civ. Code § 3426.6 (indicating a three-year statute of limitations for misappropriation of trade secrets claims); *Lebanon Cnty. Emps.' Ret. Fund v. Collis*, 287 A.3d 1160, 1195 (Del. Ch. 2022) (applying a three-year limitations period by analogy for a breach of fiduciary duty claim).

[269] Pls.' Opening Br. 3–4.

issue." *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *24 (Del. Ch. Feb. 18, 2010). The parties' briefing on the question of remedy is helpful, but the court would benefit from additional briefing in crafting a remedy that most appropriately implements the rulings set forth in this opinion. Accordingly, further proceedings will be necessary to determine the precise form of the final order.

## III. CONCLUSION

Counsel for the parties shall confer and submit an order providing for further proceedings, including supplemental briefing, that will be required to determine the remedy that most appropriately implements the rulings made in this opinion.